WILCOXON v MINNESOTA MINING & MANUFACTURING COMPANY

Docket No. 204431. Submitted April 7, 1999, at Detroit. Decided April 23, 1999, at 9:15 A.M. Leave to appeal sought.

Dallias E. Wilcoxon brought an action in the Wayne Circuit Court against Minnesota Mining & Manufacturing Company (3M) and two 3M employees, alleging race and sex discrimination in violation of the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, and other claims. The court, Deborah A. Thomas, J., in response to the defendants' first motion for summary disposition, found that the plaintiff had not demonstrated any of the criteria necessary to show that her transfer from one position to another had been an adverse employment action. The court determined that the only issue left pertained to the plaintiff's separation from 3M. The court dismissed the claim that was based on the alleged wrongful transfer and dismissed one of the individual defendants from the action. In response to the defendants' second motion for summary disposition, the court held that the plaintiff had failed to show that, with regard to her termination from employment, the plaintiff was treated differently from other employees similarly situated, the basis for such treatment was discriminatory, that 3M's stated reason for the discharge from employment was a pretext, and that the reason for the discharge was based on a factor that violated the laws of the state. The court entered an order that dismissed the action in its entirety. The plaintiff appealed.

The Court of Appeals *held*:

1. The claim regarding the transfer is a disparate treatment claim under MCL 37.2202(1)(a); MSA 3.548(202)(1)(a ). Regardless of the approach the plaintiff employed to establish her claim, she had to prove that she suffered an adverse employment action.

2. In order for an employment action to be adverse for purposes of a discrimination action, the action must be materially adverse in that it is more than mere inconvenience or an alteration of job responsibilities and there must be some objective basis for demonstrating that the action is adverse. The employee's subjective impressions regarding the desirability of one position over another are not controlling.

3. The plaintiff failed to make any showing that her transfer was a materially adverse employment action, other than advancing her own subjective views. The court properly dismissed the claim with regard to the transfer.

4. There is no dispute that the plaintiff's termination from employment qualifies as an adverse employment action. The plaintiff could have established that claim under a mixed motive theory or a pretextual theory.

5. The plaintiff, a black female, falls into two protected classes contemplated by the Civil Rights Act and, thus, meets the first element of the test applicable to actions under the mixed motive theory. She meets the second element because her termination from employment is an adverse employment action. The plaintiff therefore had to prove that the defendants were predisposed to discriminate against members of the protected class, the third element, and that the defendants actually acted on the predisposition in terminating the plaintiff's employment, the last element.

6. The occurrences of which the plaintiff complains, if believed, would not require a conclusion that the defendants acted with discriminatory animus. The plaintiff's claim cannot be proved under the mixed motive theory.

7. The plaintiff meets the first three elements of the test applicable to actions under the pretextual theory because she is a member of a protected class who suffered an adverse employment action and was qualified for the job. Therefore, the plaintiff had to show that she suffered the adverse employment action under circumstances that give rise to an inference of unlawful discrimination, the last element.

8. The court did not err in finding that the plaintiff failed to show that similarly situated male or white employees were not terminated from employment under like circumstances. Summary disposition was properly granted with regard to the pretextual theory of proof. The court properly granted summary disposition in favor of the defendants with regard to the rest of the plaintiff's claims, which alleged intentional infliction of emotional distress.

Affirmed.

1. CIVIL RIGHTS — MASTER AND SERVANT — EMPLOYMENT DISCRIMINATION — DISPARATE TREATMENT — ADVERSE EMPLOYMENT ACTIONS.

A necessarily included element of an action alleging disparate treatment of an employee by an employer in violation of subsection 202(1)(a) of the Civil Rights Act is a demonstration that the employee suffered an adverse employment action; for an employment action to be adverse for purposes of a discrimination action,

the action must be materially adverse in that it is more than mere inconvenience or an alteration of job responsibilities and there must be some objective basis for demonstrating that the change is adverse; the employee's subjective impressions regarding the desirability of one position over another are not controlling in determining whether a change of positions is adverse (MCL 37.2202[1][a]; MSA 3.548[202][1][a]).

2. CIVIL RIGHTS — MASTER AND SERVANT — EMPLOYMENT DISCRIMINATION — DISPARATE TREATMENT — MIXED MOTIVE EVIDENTIARY METHOD — ELEMENTS.
   The elements of an action under subsection 202(1)(a) of the Civil Rights Act alleging disparate treatment in employment and proceeding under the "mixed motive" evidentiary method are the plaintiff's membership in a protected class, an adverse employment action, a showing that the defendant was predisposed to discriminating against members of the plaintiff's protected class, and a showing that the defendant actually acted on that predisposition in visiting the adverse employment action on the plaintiff (MCL 37.2202[1][a]; MSA 3.548[202][1][a]).

3. CIVIL RIGHTS — MASTER AND SERVANT — EMPLOYMENT DISCRIMINATION — DISPARATE TREATMENT — PRETEXTUAL EVIDENTIARY METHOD — ELEMENTS.
   The elements of an action under subsection 202(1)(a) of the Civil Rights Act alleging disparate treatment in employment and proceeding under the "pretextual" evidentiary method are the plaintiff's membership in a protected class, and showings that the plaintiff suffered an adverse employment action, the plaintiff was qualified for the position, and the plaintiff suffered the adverse employment action under circumstances that give rise to an inference of unlawful discrimination; circumstances give rise to an inference of discrimination when the plaintiff was treated differently than persons of a different class for the same or similar conduct; being qualified for a job, for purposes of establishing a prima facie case of discrimination, requires minimal qualification only; to create an inference of disparate treatment, the plaintiff must prove that all the relevant factors were nearly identical to those of a differently treated person (MCL 37.2202[1][a]; MSA 3.548[202][1][a]).

Dallias E. Wilcoxon, in propria persona.

*Barris, Sott, Denn & Driker, P.L.L.C.* (by *Sharon Woods* and *Claudia D. Orr*), for the defendants.

Before: HOOD, P.J., and HOLBROOK, JR., and WHITBECK, JJ.

WHITBECK, J. Plaintiff-appellant Dallias E. Wilcoxon contests the dismissal, by summary disposition, of her claims of unlawful race and sex discrimination in her former employment. The trial court dismissed portions of Wilcoxon's complaint relating to a transfer on the basis of her failure to produce any objective evidence that the transfer was an adverse employment action. Just before trial, the trial court dismissed the remainder of Wilcoxon's action, primarily on the basis of her inability to identify any similarly situated members of another class who were treated differently. Wilcoxon now appeals as of right. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Wilcoxon, a black female with a master's degree in Public Administration and a law degree, began working in the government/community affairs department of the outdoor advertising subsidiary of defendant-appellee Minnesota Mining & Manufacturing Company (3M National) in 1989 as the first minority or female in that capacity. From 1990 through 1992, she received promotions, raises, and above-average performance evaluations. However, these evaluations noted a need for her to improve her working relationship with field management. As the government/community affairs manager in 3M National's Detroit area offices, Wilcoxon monitored legislative and regulatory matters affecting outdoor advertising (i.e., billboards) in the northeastern portion of the United States and worked to improve or preserve her employer's position in that regard. Additionally, Wilcoxon provided information regarding these matters as necessary to support field managers who procured and marketed the available billboard space.

During Wilcoxon's tenure with 3M National, she experienced difficulty dealing with defendant-appellee David Horton, who was the market manager and, later, district manager of the marketing department for the same territory, and at least one other market manager. Although Horton was not Wilcoxon's superior and Wilcoxon concedes that people in general found Horton difficult to work with, Wilcoxon attributed her problems relating to field management to racism and sexism. By Horton's account, however, Wilcoxon was difficult to talk to and her attitude was both condescending and offensive as perceived by him and staff members who complained to him.

Defendant-appellee Edward Kenevan became Wilcoxon's direct supervisor in May 1992. The following March, Kenevan gave Wilcoxon a below-average performance appraisal, ostensibly on the basis of her poor relationship with field management and an insufficient familiarity with the industry. In the section of the evaluation for comments by the next level of supervision, Kenevan's own supervisor observed that Wilcoxon had always been professional in his presence and that perhaps she needed a new challenge in another department. According to Kenevan, he decided to transfer Wilcoxon to the newly created position of public service/community affairs manager, in order to take advantage of her strengths, while minimizing her role in her areas of weakness. In this new position, which Wilcoxon was charged with developing, Wilcoxon was to oversee 3M National's public service and charitable activities nationwide. Wilcoxon resisted the transfer, which did not entail any loss of pay or benefits, but apparently was not

afforded a choice in the matter. Her replacement, whom she helped train for a month or two, was a white male.

Although Wilcoxon continued to work out of the Detroit area offices for seven months, her new supervisor, John Provost, made it clear that eventually Wilcoxon would have to relocate to Chicago. In January 1994, Wilcoxon went on sick leave and applied for short-term disability benefits, which she initially began receiving. Her physician described her symptoms as headache, stress/anxiety, and chest pain. Consistent with company policy, Wilcoxon's application for short-term disability benefits was submitted to physicians retained by 3M's benefits department for review. The reviewing physicians found nothing disabling about Wilcoxon's condition and reported this to 3M's benefits department personnel, who in turn advised Wilcoxon that continued benefits would be denied and that she should return to work by February 28, 1994. Wilcoxon appealed within the sixty days allotted for that purpose and forwarded additional documentation to the reviewing physicians who, again, found nothing disabling about Wilcoxon's condition. Disability benefits were again denied. Thereafter, Provost informed Wilcoxon that if she did not return to work by April 18, 1994, she would be presumed to have resigned. Wilcoxon did not return to work by that date and was thereafter notified that she was no longer employed at 3M National.

In June 1994, Wilcoxon filed a complaint alleging race and sex discrimination in violation of the Civil Rights Act (CRA), MCL 37.2101 *et seq.*; MSA 3.548(101)

*et seq.*[1] According to Wilcoxon, she was (1) provided less training than white males in similar employment positions, (2) provided less support staff than similarly situated white males, (3) undermined by defendants' employees while attempting to accomplish necessary employment functions, (4) denied reimbursement for continuing education courses, while similarly situated white males enjoyed such a benefit, and (5) demoted and replaced by a white male.

In February 1996, defendants filed their first motion for summary disposition. Defendants argued that Wilcoxon could not maintain race or sex discrimination claims because her transfer did not constitute an adverse employment action, since she suffered no loss in pay or benefits. Furthermore, defendants asserted a legitimate business reason for both Wilcoxon's transfer and her termination from employment. Defendants maintain that Wilcoxon was unable to produce any evidence that she was treated any differently than white or male employees who refused to return to work following a disability leave. Defendants contended that, because Wilcoxon was unable to establish that 3M National's reasons were a mere pretext for discrimination, Wilcoxon's race and sex discrimination claims must fail. Finally, defendants claimed that Horton could not be individually liable for the alleged discrimination because Horton did not qualify as an agent of 3M National.

In November 1996, the trial court issued its ruling from the bench. First, the trial court found that Wilcoxon had not demonstrated any of the criteria

---

[1] In addition, Wilcoxon asserted a claim of intentional infliction of emotional distress. However, the trial court dismissed this claim and Wilcoxon has not challenged this dismissal on appeal.

necessary to show that her transfer had been an adverse employment action. Second, the trial court declined to decide whether Wilcoxon had resigned or had been constructively discharged by intolerable discriminatory conditions inasmuch as "there are several questions of fact that must be resolved." Third, the trial court found that the question whether there was a legitimate nondiscriminatory reason for plaintiff's transfer was an issue for the finder of fact. Fourth, the trial court addressed whether Horton, who was not Wilcoxon's supervisor but who exercised control over her worksite, could be held personally liable for Wilcoxon's claims. The trial court stated, "even viewing it in the light most favorable to the Plaintiff" there was not a "sufficient legal basis upon which to hold Mr. Horton personally liable." According to the trial court, because Wilcoxon's transfer was not an adverse employment action, the only issue left was with regard to Wilcoxon's ultimate separation from 3M National. By a subsequent order, the trial court deemed the transfer not to be an adverse employment action and dismissed Wilcoxon's claims based on that action; the trial court dismissed Horton from the action as well.[2]

In April 1997, defendants brought three motions in limine to (1) preclude, on the basis of the trial court's prior ruling, Wilcoxon from characterizing her transfer as a demotion, (2) preclude Wilcoxon from mentioning discreet incidents of allegedly unfavorable treatment unless she laid a foundation by showing that at some point she was discriminated against by

---

[2] It was also by this order that the trial court dismissed Wilcoxon's claim of intentional infliction of emotional distress.

being treated differently than similarly situated white or male employees, and (3) preclude Wilcoxon from mentioning acts that preceded the filing of her complaint by more than three years. During a hearing regarding these motions, it was revealed that Wilcoxon had yet to identify another individual who had been treated differently when the individual failed to return to work from medical leave. In response, the trial court adjourned trial to a date that would allow sufficient time for defendants to bring another motion for summary disposition.

In May 1997, defendants brought their second motion for summary disposition pursuant to MCR 2.116(C)(10). Defendants argued that it was incumbent on Wilcoxon to show that "but for" her race or sex, she would not have been discharged. Moreover, defendants argued that because defendants asserted a legitimate nondiscriminatory reason for the employment separation, Wilcoxon would also have to establish that this was a pretext. Defendants asserted that, because Wilcoxon had not come forward with any evidence of either disparate treatment or pretext concerning her termination from employment, summary disposition in favor of defendants was proper. Defendants supported this motion by, among other things, the affidavits of Barbara Warner, supervisor of 3M's health care and disability program, and Provost. Warner averred that in performing her duties she made the ultimate decision to deny Wilcoxon benefits while unaware of Wilcoxon's race, and race or sex was not used in the decision. Warner also averred that Wilcoxon's employment status was not within the scope of her decision. Provost averred that, as Wilcoxon's supervisor at the time, after learning that

Wilcoxon was ineligible for disability leave, he notified her that she must return to work by April 18, 1994, or she would be considered as having resigned. When Wilcoxon did not so return, Provost stated that he terminated her employment.

In response to defendant's motion, Wilcoxon named a white female office supervisor, a white male sales representative, two other white males, and a white female as similarly situated employees who were not discharged when their illnesses caused their extended absences from work.[3] Further, Wilcoxon argued that a race or sex discrimination case can be established either by showing disparate treatment or by showing intentional discrimination. Wilcoxon contended that she had established a case of intentional discrimination by showing that defendants were predisposed to discriminate against women or blacks and had acted on that disposition in terminating her employment.

At a June 1997 hearing regarding this motion, defendants argued that they conducted a last-minute record search with regard to the supposedly similarly situated people identified in Wilcoxon's brief. According to defendants, two individuals could not be found, there was no record of disability leaves for two more, and the other (who had been on extended leave after a complicated pregnancy) had, unlike Wilcoxon, voluntarily returned to work at the expiration of her leave. Moreover, defendants argued, the decisionmaker with regard to Wilcoxon's disability leave did not know Wilcoxon's race and Wilcoxon had con-

---

[3] Wilcoxon's brief did not refer to any supporting documentation with regard to the identity or existence of these people, their illnesses, or their absences. In her brief on appeal, Wilcoxon contends that she herself could have testified about the circumstances of their leaves of absence.

ceded that the decisionmaker with regard to the termination of Wilcoxon's employment had never discriminated against her. The trial court issued the following ruling:

> Discovery in this matter has been closed, witness lists have been filed and there's no opportunity that these five individuals were made witnesses in this matter.
>
> The individual who made the decision with regard to the termination, would be the individual in the personnel office. Who would send out the communication, the questioned returned date that the decision-maker determines whether or not to terminate. For failure to return to work, which is the matter that remains before this Court.
>
> The burden lies upon the plaintiff to show that somehow she was treated differently than other employees similarly situated. And that the basis for such treatment was discriminatory.
>
> She does not have either the individuals who were treated differently than herself, nor has she been able to establish that the employer[']s stated reason for the discharge was a pretext. And that there was any evidence to establish that the reason for discharge was based on a factor which violated the laws of [this] state, established to protect those individuals who have historically been treated unfairly because of race.

The trial court entered an order the same day that dismissed Wilcoxon's action in its entirety with prejudice. Wilcoxon timely appealed as of right.

## II. STANDARD OF REVIEW

This Court reviews a trial court's decision regarding a motion for summary disposition de novo. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998). On a motion under MCR 2.116(C)(10), "[t]he court considers the affidavits, pleadings, depo-

sitions, admissions, and other documentary evidence submitted or filed in the action to determine whether a genuine issue of any material fact exists to warrant a trial." *Spiek, supra* at 337. On appeal, as below, all reasonable inferences are resolved in the nonmoving party's favor. *Bertrand v Alan Ford, Inc,* 449 Mich 606, 617-618; 537 NW2d 185 (1995).

### III. WILCOXON'S TRANSFER

#### A. INTRODUCTION

##### (1) DISPARATE TREATMENT VERSUS DISPARATE IMPACT CLAIMS

Section 202 of the CRA prohibits an employer from discriminating "against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." MCL 37.2202(1)(a); MSA 3.548(202)(1)(a).[4] The courts have recognized two broad categories of claims under this section: "disparate treatment" and "disparate impact" claims. *Dep't of Civil Rights ex rel Peterson v Brighton Area Schools,* 171 Mich App 428, 437-438; 431 NW2d 65 (1988). See also *Lytle v Malady (On Rehearing),* 458 Mich 153, 177, n 26 (WEAVER, J., joined by BOYLE and TAYLOR, JJ.), 185 (BRICKLEY, J., concurring); 579 NW2d 906 (1998). This case presents only a "disparate treatment" claim.

---

[4] Other subsections enumerate in more detail the categories of prohibited actions, such as limiting, segregating, or classifying employees on the basis of a prohibited criterion in a way that adversely affects them. MCL 37.2202(1)(b), (c); MSA 3.548(202)(1)(b), (c).

(2) DISPARATE TREATMENT CLAIMS

Disparate treatment claims may be established "under ordinary principles of proof by the use of direct or indirect evidence." *Town v Michigan Bell Telephone Co*, 455 Mich 688, 694-695 (BRICKLEY, J., joined by BOYLE and WEAVER, JJ.), 707 (RILEY, J., concurring in relevant part); 568 NW2d 64 (1997). "Alternatively, [courts may use] the prima facie test articulated . . . in *McDonnell Douglas Corp v Green* [411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)] as a framework for evaluating [discrimination] claims." *Town, supra* at 695 (BRICKLEY, J.). Under that test, as applied in this state, a plaintiff may establish a prima facie case of prohibited discrimination by demonstrating that the plaintiff suffered an adverse employment action under circumstances giving rise to an inference of discrimination. After the prima facie case is established, the employer has the burden of coming forward with a legitimate nondiscriminatory reason for the adverse employment action. If the employer does so, the plaintiff has the burden of proving that the stated reason is merely a pretext for discrimination, and this burden then merges with the plaintiff's overall burden of proving the claim. *Lytle, supra* at 177 (WEAVER, J.); *Town, supra* at 695-696 (BRICKLEY, J.); *Meagher v Wayne State Univ*, 222 Mich App 700, 708-712; 565 NW2d 401 (1997); *Reisman v Wayne State Univ Regents*, 188 Mich App 526, 538-539; 470 NW2d 678 (1991).

Courts often categorize disparate treatment cases by the alternative evidentiary methods used to establish them. We may label such cases as "mixed motive" (i.e., established by ordinary principles of evidence) and "pretextual" (i.e., established by using *McDonnell*

*Douglas* burden-shifting) cases. See *Harrison v Olde Financial Corp*, 225 Mich App 601, 607-611; 572 NW2d 679 (1997). See also *Simpson v Kay Jewelers, Division of Sterling, Inc*, 142 F3d 639, 644, n 5 (CA 3, 1998).[5] Where a plaintiff can present ordinary evidence that, if believed, would require the conclusion that discrimination was at least a factor in the adverse employment action, the *McDonnell-Douglas* burden-shifting framework is not applicable. Rather, a defendant's articulation of a nondiscriminatory purpose creates a "mixed motive" case. *Downey v Charlevoix Co Bd of Co Rd Comm'rs*, 227 Mich App 621, 633; 576 NW2d 712 (1998) ("racial slurs by a decision maker constitute direct evidence of racial discrimination that is sufficient to get the plaintiff's case to a jury"). Sometimes courts describe "mixed motive" cases in terms of making a prima facie case of "intentional discrimination."[6] See *Reisman, supra* at 538.

### (3) MIXED MOTIVE CLAIMS

The elements of a mixed motive case are (1) the plaintiff's membership in a protected class, (2) an adverse employment action, (3) the defendant was

---

[5] Though not binding on this Court, federal precedent is generally considered highly persuasive when it addresses analogous issues. *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 437; 566 NW2d 661 (1997). In the context of discrimination cases, federal precedent may be consulted for guidance. See, e.g., *Radtke v Everett*, 442 Mich 368, 381-382; 501 NW2d 155 (1993).

[6] As this Court has explained, and the Michigan Supreme Court has acknowledged, both "mixed motive" and "pretextual" claims are "disparate treatment" claims (as opposed to a "disparate impact" claim) and "intentional discrimination" is always a required element of such a claim. *Lytle, supra* at 177, n 26 (WEAVER, J.); *Meagher, supra* at 709. We identify these distinctions only to avoid confusion, while recognizing that categorizing cases as "disparate treatment" or "intentional discrimination" is common usage and is employed by the parties.

predisposed to discriminating against members of the plaintiff's protected class, and (4) the defendant actually acted on that predisposition in visiting the adverse employment action on the plaintiff. See *Reisman, supra* at 538. "[O]nce the plaintiff has met the initial burden of proving that the illegal conduct . . . was more likely than not a 'substantial' or 'motivating' factor in the defendant's decision, the defendant has the opportunity to show by a preponderance of the evidence that it would have reached the same decision without consideration of the protected characteristic." *Harrison, supra* at 611.

### (4) PRETEXTUAL CLAIMS

A plaintiff may establish a pretextual *McDonnell-Douglas* type prima facie case[7] of prohibited discrimination by demonstrating that "(1) she was a member of the protected class; (2) she suffered an adverse employment action . . . ; (3) she was qualified for the position; but (4) she [suffered the adverse employment action] under circumstances that give rise to an inference of unlawful discrimination." *Lytle, supra* at 172-173 (WEAVER, J.). Circumstances give rise to an inference of discrimination when the plaintiff "was treated differently than persons of a different class for the same or similar conduct." *Reisman, supra* at 538.

---

[7] " 'Prima facie case' in this context does not mean that the plaintiff produced sufficient evidence to allow the case to go to a jury, but rather that the plaintiff produced enough evidence to create a rebuttable presumption of . . . discrimination." *Meagher, supra* at 710-711.

B. THE NECESSARILY INCLUDED ELEMENT OF AN ADVERSE
EMPLOYMENT ACTION

Regardless of the approach Wilcoxon employed to establish her claims, demonstrating that she suffered an adverse employment action was a necessarily included element of her proofs. See, e.g., *Lytle, supra* at 172-173 (WEAVER, J.); *Harrison, supra* at 610-611. In fact, it was when the trial court determined that Wilcoxon's transfer was not an adverse employment action that her claims with respect to that transfer were dismissed. Hence, resolution of this issue on appeal turns on whether the trial court erred in determining as a matter of law that Wilcoxon's transfer from the position of government/community affairs manager to public service/community affairs manager was not an adverse employment action.

Wilcoxon concedes that the transfer did not involve a reduction in her salary or benefits, nor does she dispute that during the seven months that she occupied her new position, she had not been made to relocate. Conversely, defendants concede that it is possible that Wilcoxon would have been required to relocate from Detroit to Chicago, but argue that such a relocation alone cannot be considered adverse. In support of their respective positions regarding whether the transfer was an adverse action, both Wilcoxon and defendants cite *Kocsis v Multi-Care Mgt, Inc*, 97 F3d 876 (CA 6, 1996). In *Kocsis*, the plaintiff had been reassigned from the position of nursing supervisor to the position of unit registered nurse for the articulated reason of poor performance. The plaintiff's pay remained the same, but the plaintiff complained that the new position was more physically demanding. *Id.* at 879-880. In affirming the district court's grant of

summary judgment in this case alleging disability discrimination, the appellate court found that the plaintiff had not suffered an adverse employment action. The court stated that a prima facie case of discrimination requires showing an employment action that was "materially adverse," *id.* at 885, such as " 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' " *Id.* at 886, quoting *Crady v Liberty Nat'l Bank & Trust Co*, 993 F2d 132, 136 (CA 7, 1993). See also *Flaherty v Gas Research Institute*, 31 F3d 451, 456-457 (CA 7, 1994) (having to report to a former subordinate accompanied by a change in title did not equate to a materially adverse job action).

Wilcoxon argues that despite the fact that her compensation had not changed, 3M National negatively altered her job responsibilities and conditions of employment. In support, she cites *Collins v Illinois*, 830 F2d 692 (CA 7, 1987), a case of alleged race discrimination and unlawful retaliation. In that case, a consultant in a library's development group was transferred to the library's reference unit after she filed discrimination complaints with the federal Equal Employment Opportunity Commission and the Illinois Department of Human Rights. Her transfer did not reduce her pay, but (1) she went from having her own office to sitting at a desk outside her new supervisor's office, (2) she no longer had a telephone, (3) she was no longer allowed printed business cards, (4) she no longer had primary responsibility for specific projects, and (5) she was no longer listed in profes-

sional publications as a library consultant. *Id.* at 696-697. The court held that adverse employment actions were not limited "to strictly monetary considerations. One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." *Id.* at 703.

However, common to all the federal cases cited by the parties in this regard are two concepts. Specifically, in order for an employment action to be adverse for purposes of a discrimination action, (1) the action must be materially adverse in that it is more than "mere inconvenience or an alteration of job responsibilities," *Crady, supra* at 136, and (2) there must be some objective basis for demonstrating that the change is adverse because "a plaintiff's 'subjective impressions as to the desirability of one position over another' [are] not controlling," *Kocsis, supra* at 886, quoting *Kelleher v Flawn*, 761 F2d 1079, 1086 (CA 5, 1985).[8]

---

[8] See also *De La Cruz v New York City Human Resources Dep't*, 82 F3d 16 (CA 2, 1996) (transfer from an "elite" adoption care unit to a less prestigious foster care unit was a "quite thin" but sufficient adverse action); *Williams v Bristol-Myers Squibb Co*, 85 F3d 270, 273-274 (CA 7, 1996) (transfer of pharmaceutical salesman from one division to another was not an adverse action even though it was likely to, and did, initially reduce the commission portion of his earnings); *McCabe v Sharrett*, 12 F3d 1558, 1559, 1563 (CA 11, 1994) (transfer without pay reduction of police chief's secretary to a clerk/typist position in another department that was two pay grades lower was adverse because it decreased her opportunity for pay increases and involved more menial tasks); *Harlston v McDonnell Douglas Corp*, 37 F3d 379, 382 (CA 8, 1994) (secretary reassigned to a position with same pay and benefits, but required to watch the door and listen for the fax machine, had not suffered an adverse employment action); *Christensen v Equitable Life Assurance Society*, 767 F2d 340 (CA 7, 1985) (termination of Indianapolis division manager's employment after he failed to accept transfer to position of associate division manager in Chicago was an adverse employment action); *Haimovitz v United States Dep't of Justice*, 720 F Supp 516, 526 (WD Pa, 1989), aff'd

Here, Wilcoxon failed to make any showing at all that her transfer to the new position was an adverse employment action, other than advancing her own subjective views on the subject. While ceasing her involvement in government affairs affecting outdoor advertising in the northeastern United States, she was taking on responsibility for the company's public service activity nationwide. Given that she was expressly charged with developing the position, we can hardly impute to defendants the fact that she did not do so. Unlike the defendant in *Collins*, 3M National did not strip Wilcoxon of the accouterments of her former position. In fact, Wilcoxon advanced no objective reason why the new position would be unbearable or even undesirable.[9] Because Wilcoxon bore the burden of proof, it was incumbent on her to present some evidence showing why the transfer was "materially adverse." Without some demonstration that there was a contestable issue of material fact in this regard, the trial court did not err in finding, as a matter of law,

---

902 F2d 1560 (CA 3, 1990) (Immigration and Naturalization Service attorney who retired rather than accept a transfer from Pittsburgh, Pennsylvania, to Harlingen, Texas, during a reorganization had not suffered an adverse employment action).

[9] Defendants point out that Wilcoxon's potential relocation to Chicago actually never occurred. Hence, they argue, it is speculative whether she would have been required to do so had she refused. Moreover, it is impossible to measure what potential hardships may have resulted from such a relocation and to what extent defendants may have been able to alleviate those hardships. Additionally, Wilcoxon criticizes the new position on the basis of her assessment of its potential for advancement. At the same time, it is clear that there were no positions in her department, higher than the one she held, in the Detroit offices. Hence, advancement itself would have required relocation. Moreover, Wilcoxon argued in response to the first motion for summary disposition that any suggestion that she was unwilling or unable to relocate was disingenuous, a position more than a little at odds with her position that a transfer was an adverse employment action.

that Wilcoxon's discrimination claims must fail with regard to the transfer.

By the same order that disposed of Wilcoxon's claims regarding the transfer, the trial court dismissed Horton as a party defendant. Although Wilcoxon argues that Horton was the source of much of her discontent, she does not specifically argue on appeal (or support with authority) that the trial court erred in dismissing Horton in his individual capacity. Therefore, we presume this issue to be abandoned. *Schellenberg v Rochester Elks*, 228 Mich App 20, 49; 577 NW2d 163 (1998).

### C. CONCLUSION

Because Wilcoxon failed to produce any objective evidence that her transfer was a materially adverse employment action, she did not establish that a material issue of fact existed that would warrant a trial of her race and sex discrimination claims with regard to that transfer. We therefore hold that the trial court properly granted summary disposition to defendants with regard to those claims.

### IV. WILCOXON'S TERMINATION FROM EMPLOYMENT

### A. INTRODUCTION

With respect to Wilcoxon's termination from employment at 3M National, there is no dispute that the termination qualifies as an adverse employment action. Hence, Wilcoxon could have established her action for discrimination in two different ways, as noted above. First, Wilcoxon could proceed under a

mixed motive theory. Alternatively, she could proceed under a pretextual theory.

### B. MIXED MOTIVE THEORY

It is not disputed that as a black female Wilcoxon falls into two protected classes as contemplated by the CRA; she therefore meets the first element of the test. As noted, there can be no dispute that termination of employment is an adverse employment action; she therefore meets the second element of the test. The question then becomes whether defendants were predisposed to discriminate against members of the protected class, the third element of the test, and whether defendants actually acted on that predisposition in terminating Wilcoxon's employment, the fourth element of the test.

Wilcoxon contends that she established enough evidence of defendants' discriminatory animus, if believed, to require a conclusion that unlawful discrimination was at least a motivating factor in her discharge. Hence, it is necessary, as a threshold matter, to examine the occurrences of which she complains to see if they rise to a level that such a conclusion would be required. See *Harrison, supra* at 610. We hold that they do not.

Specifically, Wilcoxon alleges that when she applied for a position with 3M National, she was asked by an interviewer how she would handle racism inside and outside the company; that a secretary walked into her office one time without knocking; that Kenevan once asked one of her counterparts to ask her why she had made a certain managerial decision; that two other of her counterparts told her that Horton had contacted them and told them how

Wilcoxon ought to be operating her territory; that for several years, she did not have a key to the office building and thus had to leave when it closed at 5:00 P.M.; that after she got a key to the office building, Kenevan would telephone her near the end of the day, keeping her at the office after everyone else had left, exposing her to danger when she walked to her car alone; that one of the market managers would not return her telephone calls; that Horton refused to deal with her unless he absolutely had to; that she had no secretarial assistance and often had to prepare documents longhand; that Horton would not let her use his office supplies so she had to buy office supplies from Target; that a temporary office worker, engaged for the purpose of alleviating Wilcoxon's secretarial needs, took inaccurate telephone messages and put calls through after being asked to hold them and that after she spoke with the temporary employee about this, Horton, to whom she did not report, took it upon himself to criticize her treatment of the office worker; that Horton referred to office workers as "girls," even if they were older than him; and that Kenevan once asked her "whether or not it was correct that folk wanted a cigarette after sex."

We find that these incidents, and others like them, if believed, would not require a conclusion that defendants acted with discriminatory animus. Rather, these are the types of incidents than could be motivated by factors other than proscribed discrimination or could have nothing to do with racial or sexual animus.

### C. PRETEXTUAL THEORY

Again, it is not disputed that Wilcoxon is a member of a protected class and therefore meets the first ele-

ment of the test. Because discharge from employment is an adverse employment action, she meets the second element of the test. Being qualified for a job, for purposes of establishing a prima facie case of discrimination, requires only minimal qualification. See *Town, supra* at 699 (BRICKLEY, J.) ("An employee is qualified if he was performing his job at a level that met the employer's legitimate expectations."). The parties do not dispute that Wilcoxon was so qualified and she therefore meets the third element of the test. Hence, Wilcoxon's pretextual theory with regard to her termination from employment turns on whether she suffered the adverse employment action under circumstances that give rise to an inference of unlawful discrimination. *Lytle, supra* at 172-173 (WEAVER, J). The question then becomes whether Wilcoxon demonstrated that similarly situated nonblack or nonfemale employees were not terminated from employment. *Reisman, supra* at 538. In fact, it is upon its finding that Wilcoxon had not identified any similarly situated male or white employees who were not terminated from employment under like circumstances that the trial court granted summary disposition to defendants with regard to her claims.

Wilcoxon argues that she identified, or indicated to the trial court that she could identify, five other employees of 3M National who were granted medical leave and were allowed to remain on medical leave until released by their doctors. Assuming arguendo that naming, or coming close to naming, these individuals was sufficient to create a triable fact regarding their existence, the question whether they are similarly situated depends on how they are characterized. Clearly, Wilcoxon failed to identify anyone who,

after being denied disability leave and then failing to return to work, was not terminated from employment. According to her, all those she identified were granted leave. See *Town, supra* at 699-700 (BRICKLEY, J.) ("To create an inference of disparate treatment, [a plaintiff] must prove that . . . 'all of the relevant aspects' . . . were 'nearly identical' to those of [a differently treated person].") (citation omitted).

However, if Wilcoxon was actually complaining about the fact that these employees were granted medical leave and she was not, then they may have been similarly situated. Wilcoxon could show that these employees were treated differently only by demonstrating that (1) their disability leave applications had not been subjected to independent review, (2) an independent review had deemed the others fit to return to work, but they had not been so required, or (3) the other leave applicants had presented substantially similar symptoms and documentation, but had not been deemed fit for return to work. There is nothing in the evidentiary record supporting *any* of these alternatives. The trial court therefore did not err in deciding, by summary disposition, that Wilcoxon had failed to produce any evidence that she had been treated differently than others similarly situated.

### D. CONCLUSION

Because Wilcoxon failed to produce evidence that, if believed, would require the conclusion that her race or her sex was at least a motivating factor in her termination from employment, summary disposition was proper regarding her mixed motive theory of proof. Because Wilcoxon failed to establish, by admissible

evidence, that defendants treated similarly situated white or male employees differently with respect to termination from employment, summary disposition was proper regarding her pretextual theory of proof. We therefore hold that the trial court properly granted summary disposition to defendants with regard to the balance of Wilcoxon's claims.

Affirmed.