**Agnes MEANS, Plaintiff–Appellant,**

v.

**CELLCO PARTNERSHIP, Doing business as Verizon Wireless, Defendant–Appellee.**

**No. 10–1937.**

United States Court of Appeals, Sixth Circuit.

March 5, 2012.

Before: BOGGS and GIBBONS, Circuit Judges, and RUSSELL, District Judge.*

JULIA SMITH GIBBONS, Circuit Judge.

Plaintiff–Appellant Agnes Means was a manager at a retail location in Michigan operated by Defendant–Appellee Cellco Partnership (referred to as "Cellco" and also more commonly known as Verizon Wireless). Means suffers from glaucoma, which limits her ability to drive at night, and a pinched nerve in her back, which limits her mobility. In 2008, approximately three months after Means was placed under the supervision of a new district manager, she left the company on short-term disability leave and eventually severed her employment with Cellco under the company's long-term disability plan. She subsequently filed this lawsuit, claiming that Cellco failed to accommodate her conditions, that she suffered disability discrimination, and that she was retaliated against for having made a report about her concerns to Cellco's human resources department. The district court granted summary judgment in favor of Cellco on all of Means's claims. For the reasons that follow, we affirm the decision of the district court.

I.

Defendant Cellco is a telecommunications company that sells wireless voice and data communication services and products. Cellco organizes its nationwide array of retail locations into smaller groupings called districts, which are supervised by district managers. Retail Sales Managers ("RSMs") at the retail locations report to a district manager.

Plaintiff Agnes Means was employed as a RSM at Cellco's Briarwood Mall location in Ann Arbor, Michigan. She started with Cellco in 2000 and began her role as Briarwood's RSM in 2006. Her job responsibilities as an RSM included: managing a team of Retail Sales Representatives ("RSRs"), financial reporting, customer service, managing inventory, and remaining knowledgeable of current wireless products and services.

Means suffers from a number of health problems that led her to seek accommodations from Cellco under its disability-accommodations policy. She was diagnosed with advanced glaucoma, which had severely diminished her night vision. As a result, Means had difficulty driving in the dark on interstate and rural roads. She

* The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

requested an accommodation that would allow her to avoid driving at night. In December 2005, Cellco approved an accommodation that "[met Means's] request of not working night shifts during the winter months and schedule[d] her to be available and working on shifts that support the business and employees." The accommodated schedule provided that: (1) during the winter months, Means would be scheduled only until 4:00 p.m., (2) she would work four Saturdays a month during the winter months, (3) the district manager would attempt to avoid scheduling meetings at night and make accommodations for her when this could not be avoided, and (4) during the summer months, Means would work three nights a week and two Saturdays per month.

Means also sought an accommodation for difficulties arising out of a pinched nerve in her back, which prevented her from standing for long periods of time and made it difficult for her to bend over or lift objects over thirty pounds. In March 2008, she completed a Workplace Arrangement Request Form in which she requested a chair to sit in at the Briarwood kiosk to reduce the pressure on her back. Cellco granted this request as well, and a chair was placed inside the Briarwood kiosk.

Steven Sypniewski was Means's district manager during the period in which her claims arose, from May through July 2008. Sypniewski was responsible for eight mid-Michigan retail locations, designated District # 7, including the Briarwood location. Sypniewski became the District # 7 manager on May 1, 2008. According to Cellco Regional President Greg Haller, Sypniewski was brought in because District # 7 was underperforming, and Haller believed it had the potential to perform better under Sypniewski's direction. Sypniewski attempted to improve the performance of the eight retail locations in the district by hosting daily conference calls with the RSMs, taking part in training, conducting on-site inspections, and providing feedback and recommendations. Means's location fell below average on certain objective performance measures, and Sypniewski challenged her to improve in those areas. There were also reports that Means directed her RSRs to contact managers at other locations if they had product or operations questions.

The facts underlying Means's allegations are somewhat in dispute. In late June 2008, Sypniewski visited the Briarwood location with Haller. During this visit, Haller inquired about the presence of a chair inside the kiosk, which he felt was unusual. Means informed Haller that she needed to use the chair because of her back problems. Haller told Means that he expected her to be standing on the floor greeting customers for at least six hours of her eight-hour shift. Means agreed that there were many instances during a shift in which an RSM would have to be on his or her feet and moving about to perform the essential functions of the job, including observing RSR's interactions with customers, engaging with customers, and moving inventory to and from the stock room. Neither Haller nor Sypniewski claimed they knew how often Means used the chair in her kiosk on a daily basis, but Sypniewski asserted that he also communicated his expectation the chair be used only intermittently to rest and that she be on her feet for the bulk of her shift. Means claims that Sypniewski stated that the chair would be removed, but Sypniewski denied ever making any such statement. It is undisputed, however, that the chair remained in the kiosk until Means left the Briarwood location on medical leave, and the managers never took action to remove it.

Also in June 2008, when products were found to be missing from the Briarwood location (called shrinkage), potentially due to theft, Sypniewski changed Means's work schedule and asked her to work two weekend shifts per month and three late nights per week during the months of June and July 2008. Sypniewski believed that the product theft was occurring at night and that Means's presence as an RSM on more evening shifts would resolve the shrinkage issue. Means, who had been working primarily day shifts up to this point, felt that this change was not warranted since she believed that it was just as likely that the thefts occurred during the day, and even if the products were stolen at night, new security cameras installed in the stock room would have solved the issue without the need to change her schedule. Means did inform Sypniewski of her glaucoma condition that made driving after dark difficult. Means, however, also acknowledged that under her previous supervisors she was also required to work evening shifts during the summer months when there was sufficient daylight into the evening hours.

During a face-to-face meeting in June 2008, Sypniewski and Means discussed how the location was being run and possible options for her future with Cellco. According to Means, Sypniewski believed that things were not going well at the Briarwood location and presented her with "three doors" available to her: (1) she could quit the company, (2) she could take a position as a customer-service representative in an Ann Arbor store, or (3) she could stay in her current position as the Briarwood location RSM and "in three months [she] would no longer have a job." The customer service position would have greater scheduling flexibility and would allow Means to sit while performing her work. But it would also have been a demotion and likely would have entailed a pay reduction, although Sypniewski indicated that he would attempt to reduce the difference between the salaries of the two positions.

On July 21, 2008, Means complained to Cellco human-resources representatives, claiming that Sypniewski was treating her unfairly and differently from other employees. According to Means, Sypniewski was aware that she had lodged a complaint against him, and she thought his tone in subsequent conversations indicated that he was upset with her.

On August 5, 2008, Means informed human resources that she was taking a medical leave of absence upon the advice of her psychiatrist. Means applied for and was placed on short-term, and eventually long-term, disability leave. Her employment with Cellco was terminated, pursuant to the terms of the company's Managed Disability Plan, on January 30, 2009. Means filed this lawsuit on March 9, 2009.

Means filed her suit in Michigan state court, claiming violations of Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101 et seq., and Elliot–Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq. Means alleged that Cellco discriminated against her based on disabilities related to her back and glaucoma conditions and had failed to provide necessary accommodations. She also claimed that she had been retaliated against after she complained to human resources of this alleged discriminatory treatment.[1] Cellco removed the suit to the federal court based

1. The complaint also included a claim of gender discrimination, but Means has not challenged the dismissal of this claim on appeal.

on the diversity of citizenship of the parties. After the close of discovery, Cellco moved for summary judgment, and on June 24, 2010, the district court granted Cellco's motion. This appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*. *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir.2010). The factual evidence and all reasonable inferences are viewed in favor of Means as the nonmoving party at summary judgment. *See id.* Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

First, Means alleges in her complaint that during her employment with Cellco, the company "refused to recognize or accommodate [her] for her disability as a result of a pinched nerve in her back and glaucoma." To establish a *prima facie* case that she was denied a reasonable accommodation under the PWDCRA, Means must show that: (1) she is disabled within the definition of the Act, (2) Cellco knew of the disability or should reasonably be expected to know of it, (3) an accommodation would allow Means to perform her job, and (4) Cellco refused to make such an accommodation. *See Bachman v. Swan Harbour Ass'n*, 252 Mich.App. 400, 653 N.W.2d 415, 433 (2002). A requested accommodation for a disability must not impose an undue hardship on the employer and must be reasonable. Mich. Comp. Laws § 37.1102(2) ("[A] person shall accommodate a person with a disability for purposes of employment ... unless the person demonstrates that the accommodation would impose an undue hardship."); *Buck v. Thomas M. Cooley Law Sch.*, 272 Mich.App. 93, 725 N.W.2d 485, 491 (2006) ("[D]enial of some or all of a request for accommodation is not a violation of the [PWDCRA] if that denial is not unreasonable.").

■ Even if we assume, *arguendo*, that Means's back and glaucoma conditions constituted disabilities within the meaning of the PWDCRA, Means is unable to show that Cellco refused to provide reasonable accommodations for these conditions. First, Means claims to suffer from a back condition that made it difficult for her to stand for long periods of time, walk long distances, bend over, or lift object over thirty pounds. In March 2008, Means completed a Workplace Arrangement Request Form in which she requested a chair to sit in at the Briarwood kiosk to reduce the pressure on her back. This request was granted, and a chair was placed at the location. Her failure-to-accommodate claim for her back condition appears to hinge on the allegation that her supervisor, Sypniewski, threatened to remove the chair from the kiosk and ordered her not to use it. It is nevertheless undisputed that a chair remained in the kiosk until Means left the Briarwood location on medical leave and that Cellco management never took action to remove it. Because Cellco gave Means a chair—per her request—to accommodate her back condition and because that chair was available throughout her employment, Means's failure-to-accommodate claim for her back condition must fail, and summary judgment in favor of Cellco on this claim was proper.

■ Likewise, even assuming that Means's glaucoma rendered her disabled

under the PWDCRA and she was entitled to an accommodation, Means cannot show that Cellco failed to provide necessary, reasonable accommodations for this condition. Means's failure-to-accommodate claim for her glaucoma apparently arises out of the fact that Sypniewski changed her work schedule because of possible theft problems at the Briarwood location and required her to work three evening shifts per week during June and July 2008. Approximately two and a half years earlier, Cellco had approved Means's accommodation request that would allow her to avoid driving at night during the winter months. It provided that she would be scheduled to work until 4:00 p.m. during the winter months and that during the summer months she would work three nights a week. Under arrangements made with her former supervisor, Means already worked one closing shift per week during the summer months, so under Sypniewski she was merely required to work two additional nights per week during June and July 2008. Further, Means admitted that there was enough daylight remaining after the evening shifts that she worked during this two month period for her to drive home safely. Therefore, by scheduling Means to work three evening shifts per week in these summer months, Cellco was not requiring her to drive home in the dark. Means cannot establish that she needed a scheduling accommodation to avoid driving at night during the months of June and July 2008. Accordingly, Means's failure-to-accommodate claim for her glaucoma condition must also fail since she cannot show that Cellco refused to make an accommodation for her disability. *See Bachman*, 653 N.W.2d at 433. Summary

judgment in favor of Cellco was appropriate for this claim as well.

### III.

Means also claims that she was discriminated against on account of her disability in violation of the PWDCRA. To prove a claim of disparate treatment discrimination under the PWDCRA, a plaintiff must show that: (1) she is disabled, (2) the disability is unrelated to her ability to perform her job duties, and (3) she has been discriminated against in one of the ways prohibited under the PWDCRA—such as failing to promote an individual; discriminating against an individual with respect to compensation; or limiting, segregating, or classifying an employee in a way that adversely affects the status of the employee or deprives her of employment opportunities because of the individual's disabilities. Mich. Comp. Laws § 37.1202; *Peden v. City of Detroit*, 470 Mich. 195, 680 N.W.2d 857, 863–64 (2004). Even if we assume again that Means was disabled under the PWDCRA, she still cannot demonstrate that she has been discriminated against or treated differently from the other RSMs under Sypniewski's supervision on account of her disabilities.

Means's claims of disparate treatment are conclusory and not borne out in the record. Her allegations of disparate treatment, like her failure-to-accommodate allegations, seem to revolve around her use of a chair at the Briarwood kiosk and the requirement that she work three closing shifts a week during the months of June and July 2008.[2] In her complaint, Means alleges that Cellco "took [her] chair, and require[d] her to stand for six consecutive hours while performing her job." Aside

2. Means also appears to raise a hostile-work-environment discrimination claim in her appellate brief. Because this claim was not raised in her complaint or before the district court, it is not properly before this court. *See*

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir.2008) (stating that generally "an argument not raised before the district court is waived on appeal to this Court").

from being factually incorrect, this allegation was not backed by any evidence that tended to show that Cellco allowed other RSMs to sit in chairs for extended periods while working at kiosk store locations or that other RSMs were not expected to be on their feet for long periods of time while performing their duties. '

Likewise, Means alleged in her complaint that Cellco changed her schedule to work three nights a week, which was "unlike any other manager." In her deposition testimony, however, Means admitted that she did not know the schedules of the other managers, so she could not claim that she was given a less convenient schedule than another manager. She also could not name a manager at a similar mall-kiosk location who was given different, less onerous duties. Thus, Means cannot establish a *prima facie* case of disparate-treatment discrimination due to her alleged disabilities because she has not provided any evidence that she was treated differently from any otherwise similarly situated RSM.[3] The district court properly granted summary judgment on this discrimination claim in favor of Cellco.

## IV.

Finally, Means claims that she was retaliated against for having complained to Cellco's human-resources department about Sypniewski's allegedly discriminatory treatment. To establish a *prima facie* case of unlawful retaliation under the EL-CRA or PWDCRA, a plaintiff must show that (1) she engaged in protected activity, (2) the activity was known by the defendant, (3) the defendant took action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and adverse action. *Aho v. Dep't of Corr.,* 263 Mich.App. 281, 688 N.W.2d 104, 108 (2004). Means cannot establish that she suffered an adverse employment action after lodging her complaint nor can she show that there was a causal connection between the complaint and any adverse action taken against her.

■ On July 21, 2008, Means complained to human-resources representatives, claiming that Sypniewski was treating her unfairly. According to Means, Sypniewski was aware that she had lodged a complaint against him, and she thought his "tone" in a conversation that occurred between July 21 and her last day of work on August 1, indicated that he was upset with her. In her complaint, Means alleges that as a result of her conversation with the human-resources department, she was subjected to retaliation including an increased workload, harsher scrutiny of her work performance, and unwarranted discipline and schedule changes.

There is no evidence in the record that supports these allegations—aside from the perceived change in tone—that Sypniewski changed his behavior towards Means after she lodged her complaint with human resources. On the contrary, it does not appear that Sypniewski made any changes at all. The post-complaint conversations that

---

**3.** Even if Means could establish a *prima facie* case of disparate treatment discrimination, she cannot establish that the legitimate, nondiscriminatory reasons given by Cellco for the actions taken against her (a concern over possible theft and supervisory problems at the Briarwood location and a concern that overuse of a chair would prevent a RSM from fulfilling her duties) were pretextual. *See Billings v. Mich. Ability Partners,* No. 291889, 2010 WL 2977536, at *5 (Mich.Ct.App. July 29, 2010), *rev'd on other grounds,* 489 Mich. 856, 795 N.W.2d 10 (2011) ("[I]f the defendant provides a non-discriminatory explanation for plaintiff's termination, the burden shifts back to the plaintiff, who must present evidence to demonstrate that defendant's alleged non-discriminatory purpose was mere pretext and that the decision was actually motivated by discriminatory animus.") Means's discrimination claim fails on these grounds as well.

Sypniewski had with Means covered the same topics, such as her performance as a manager, the performance of the Briarwood location, and the possible transfer to a customer-service position, that were the subjects of discussions occurring prior to the complaint. There is no probative evidence that her workload increased or that she was subjected to harsher scrutiny of her work performance during the eleven-day period after she made her complaint. Furthermore, the allegation that she was subjected to unwarranted discipline and schedule changes is also unsupported. Means was never formally disciplined or placed on a performance-improvement plan, either before or after the complaint. Finally, the changes to Means's schedule, in which she was required to work three evening shifts per week, occurred a month earlier in June 2008. Because there were no materially adverse changes to Means's working conditions after she lodged her complaint, she cannot show that she was subjected to an adverse employment action. *See Wilcoxon v. Minn. Mining & Mfg. Co.*, 235 Mich.App. 347, 597 N.W.2d 250, 258 (1999) (showing that a change in circumstances is necessary to establish an adverse employment action and that this change must be more than a mere inconvenience or alteration of job responsibilities).

And even if Means could show that she suffered from an adverse employment action, she cannot further establish that any actions she complained of were caused by her complaint to human resources. To establish causation in a retaliation action, a plaintiff must show that her participation in the protected activity was a "significant factor" in the employer's adverse employment action, not merely that there was some causal link between the two. *Barrett v. Kirtland Cmty. Coll.*, 245 Mich.App. 306, 628 N.W.2d 63, 70 (2001) (citing *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir.1999)).

Because the allegedly retaliatory actions taken by Sypniewski-increased scrutiny and alterations to her work schedule—occurred largely before she made her report to human resources, she cannot show any causal linkage, let alone establish that her report was a "significant factor" leading to the alleged adverse actions. Accordingly, Means cannot establish a *prima facie* case of unlawful retaliation under the ELCRA or PWDCRA and the district court properly granted Cellco summary judgment on this claim.

V.

For the reasons provided above, we affirm the district court's judgment. The district court properly granted summary judgment in favor of Cellco on Means's failure-to-accommodate claims, her disability-discrimination claim, and her retaliation claim.