# STATE OF MICHIGAN

# COURT OF APPEALS

ALI MAZLOUM,

       Plaintiff-Appellant,

v

MICHAEL BEMIS and BENNY N. NAPOLEON,

       Defendants-Appellees,

and

DEPUTY CHIEF TONYA GUY, WAYNE
COUNTY SHERIFF'S DEPARTMENT and
WAYNE COUNTY,

       Defendants.

UNPUBLISHED
July 3, 2018

No. 336930
Wayne Circuit Court
LC No. 15-001628-CD

Before: BECKERING, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

In this action alleging race and religious discrimination, brought under Michigan's Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, plaintiff, Ali Mazloum, appeals as of right from the trial court's order granting summary disposition in favor of defendants, Wayne County Sheriff Benny Napoleon and Executive Sergeant (now retired) Michael Bemis.[1] We affirm.

## I. STATEMENT OF PERTINENT FACTS

Plaintiff began working for the Wayne County Sheriff's Department at the age of nineteen in 1999. In 2004, he graduated from the Police Academy and received his gun and

---

[1] Defendants Wayne County and Deputy Chief Tonya Guy were dismissed after mutual acceptance of case evaluation awards. Defendant Wayne County Sheriff's Department was dismissed by stipulation of the parties prior to the summary disposition hearing. Thus, only remaining defendants are appellees Napoleon and Bemis.

-1-

badge from then-Sheriff Warren Evans. Six years later, plaintiff applied for a federal position with United States Customs and Border Protection ("CBP"), which led to a voluntary polygraph examination as part of the application process on November 1, 2013.[2] Special Agent David Pelfrey, in the CBP's Credibility Assessment Division of the Office of Internal Affairs, conducted the polygraph. The examination entailed the polygraph test itself as well as pre- and post-test discussions between plaintiff and Pelfrey. At the end of the polygraph test, plaintiff learned that he had failed, and Pelfrey explained that a question about having inside information or knowledge about criminal activity triggered an alert. That prompted additional discussion between the two. The next day, Pelfrey prepared a Polygraph Report in which he conveyed the polygraph examination result and summarized several "relevant admissions" plaintiff had made after the examination.

In his report, Pelfrey indicated that "[w]hile currently serving as a Wayne County Sheriff's Deputy," plaintiff "failed to report that his relatives run a credit card fraud ring. He has known of this fraud ring since 2004, when he was asked to participate, but he refused." Pelfrey's report indicates that plaintiff described how the fraud scheme operated and explained that the relative who asked him to participate in the fraud was still active, using a Mobile gas station and other businesses he owned to further the fraud. Pelfrey attributed plaintiff as stating that the credit card fraud is a "learned trade" in his community. Plaintiff refused to disclose the name of the involved relative to Pelfrey. Pelfrey reported that plaintiff believed he should have reported this activity because he was already employed as a Wayne County Sheriff's Deputy. Moreover, "[h]e knows that the credit card ring is acting illegally, and he knows that as he is currently serving as a Wayne County Sheriff's Deputy, that he should report this activity." Pelfrey's report also summarized plaintiff as admitting that the relatives will periodically order fuel to re-supply the Mobile station, and then change ownership of the station in order to avoid paying for the re-supply of fuel, which can result in non-payment of over $100,000 when this activity occurs. Pelfrey reported that plaintiff believed the total amount of criminal activity by this relative could exceed $1,000,000 since 2004. Pelfrey also reported that plaintiff admitted to taking two cycles of illegal steroids, also while serving as a Sheriff's Deputy, which he purchased from someone at his gym; during two separate ten-day cycles, he took approximately 200 pills of the drug Dianabol. Pelfrey reported that plaintiff divulged having illegally carried a handgun four times when he was 14 years old, as he would access his uncle's gun whenever he wanted it.

On November 13, 2013, CBP Special Agent Jason Nadolinski contacted the Wayne County Sheriff's Department (Department) Internal Affairs Section to report that plaintiff was a current applicant for his agency and that, during the application process, plaintiff had made admissions of criminal activity that had occurred prior to, and during, his employment with the Department. Executive Sergeant Bemis was assigned to investigate the matter. Nadolinski emailed to Bemis a copy of Pelfrey's report, and Bemis requested an audio recording of the examination, which was provided to him. Bemis testified at his deposition that even after

---

[2] Prior to the polygraph examination, plaintiff signed a waiver agreeing that, among other uses, "[A]nything you do or say can be used against you in court."

-2-

enhancing the sound, he could decipher only about 70% of Pelfrey's questions and responses to plaintiff's answers; plaintiff's answers were more difficult to hear.

Bemis interviewed plaintiff on December 10, 2013. Plaintiff claimed that Pelfrey had mischaracterized or taken his statements out of context. He denied having any immediate relatives involved in a credit card fraud ring or even having used the word "relative." He said that he had speculated that those involved were at best third or fourth cousins because he did not want anyone thinking he was dishonest if the perpetrators were from the same part of Lebanon as he was and turned out to be distant relatives. He told Bemis that the person who approached him at some point between 2001 and 2005 with an invitation to participate in the "credit card scam" was Jimmy Derbash,[3] a classmate from high school. Plaintiff said that Derbash did not discuss the details of the fraud, that he has not seen Derbash since the approach, and that he did not report the encounter or the credit card fraud because he did not have "enough reasonable suspicion to report it." Plaintiff said that the information he gave to Pelfrey about the fuel purchase fraud at the station was "hypothetical" and that he did not have specific information about it nor does he know anyone who commits this type of fraud. With regard to his alleged steroid use, plaintiff stated that a man at the gym showed him a bottle of Dianabol, but that he had legitimately purchased the pills from a vitamin store. He did not deny having told Pelfrey that he purchased the Dianabol from someone at his gym.[4] Bemis summarized his findings in a February 7, 2014 written report sent to Captain Alan Bulifant.

As a result of the investigation, the Department charged plaintiff with a number of violations related to the Department's code of ethics and rules about conduct, personal association, personal integrity, and personal responsibilities that undermine the structure of law enforcement. Following a February 27, 2014 administrative review and determination hearing, Deputy Chief of Internal Controls, Tonya Guy, determined that plaintiff was guilty as charged and terminated his employment. The matter proceeded to arbitration. The arbitrator generally credited plaintiff's account of his conversation with Pelfrey, and he noted the Department's main concern was with plaintiff's failure to report alleged criminal activity. The arbitrator concluded that plaintiff's "failure to report an approach to him eight years previously, when arguably he should have reported the approach, where it was "not clear" whether plaintiff knew of ongoing credit card fraud activities, did not merit discharge for cause of a 15-year veteran of the department with no recent disciplinary history. Thus, the arbitrator reinstated plaintiff with full seniority, but without back pay or benefits. The arbitrator indicated his disinclination to reward plaintiff for being less than forthright with Sgt. Bemis during parts of the interview and for not reporting the invitation to participate in the credit card fraud, even though he knew he should have. The arbitrator further stressed: "it must be made very clear that there is absolutely no evidence whatsoever that the Department or the County discriminated in any way against Corporal Mazloum because of his race, ethnicity, or religion. This Arbitrator is very emphatic

---

[3] The name also appears in the record as "Durbash" and "Dirbash."

[4] As for the gun he admitted to playing with and carrying as a 14-year old, which was owned by his uncle, plaintiff stated that he had since learned from his uncle that it was a pellet gun, not a firearm.

on this point. This was clearly a police administration matter that caused concern to very experienced administrators having high standards."

Plaintiff returned to work on January 27, 2015. On February 6, 2015, he filed a two-count complaint alleging violation of the Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, and defamation *per se*. On June 8, 2015, he submitted a request for restoration of police powers, which Sheriff Napoleon denied. Approximately four months later, plaintiff amended his complaint to add a count of retaliation against Sheriff Napoleon, alleging a direct causal link between his lawsuit and Sheriff Napoleon's denial of his request to have his police powers reinstated. After dismissal of all defendants except Sgt. Bemis and Sheriff Napoleon, the trial court granted summary disposition in favor of these two remaining defendants. This appeal followed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews a trial court's summary disposition decision de novo. *Hazle v Ford*, 464 Mich 456, 461; 628 NW2d 515 (2001). Defendants moved for summary disposition under MCR 2.116(C)(1) (lack of personal jurisdiction), (C)(8) (failure to state a claim), (C)(7) (immunity granted by law), and (C)(10) (no genuine issue of material fact, movant entitled to judgment as a matter of law). The trial court did not specify on which ground it granted summary disposition, but because the court appears to have considered the depositions and other documents that the parties presented, it presumably relied on (C)(10). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999). It requires a trial court to consider affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). If the documentary evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, the trial court may grant the motion. *Id*. MCR 2.116(C)(10), (G)(4). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich. 177, 183; 665 NW2d 468 (2003).

### B. DISCRIMINATION

Plaintiff first contends that the trial court erred by basing its grant of summary disposition to defendants on the erroneous assumption that plaintiff had to meet the requirements of the *McDonnell-Douglas* test in order to establish a prima facie case of discrimination. We disagree.

A plaintiff may prove unlawful discrimination with direct or indirect evidence. *Hazle*, 464 Mich at 462. Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id*. (quotation marks and citation omitted). Examples of direct evidence sufficient to advance a plaintiff's case to a jury are racial slurs by a decision maker, *Harrison v Olde Financial Corp.*, 225 Mich App 601, 610; 572 NW2d 679 (1997), or evidence that managers disparaged and

-4-

"pick[ed] on" older workers while giving preferential treatment to younger workers, *Downey v Charlevoix Co Bd of Rd Comm'rs*, 227 Mich App 621, 716-717; 576 NW2d 712 (1998).

Plaintiff contends that use of the phrase "learned trade" in reference to the alleged credit card fraud constitutes direct evidence of impermissible bias in the form of a bigoted stereotype. Initially, it is worth noting that the phrase comes directly from CBP Special Agent Pelfrey's written report, attributing the words as having come from plaintiff himself, although plaintiff denies saying it. Nevertheless, unlike racial slurs or disparaging comments about older workers, nothing about the phrase necessarily links it to a particular protected group. There is no record evidence to support plaintiff's interpretation of the "learned trade" statement as indicating that racial or religious discrimination was a factor in his termination. Nowhere in plaintiff's deposition, or anywhere else in the record, is there evidence that plaintiff—or anyone else— heard or knew about any anti-Arab or anti-Muslim sentiments, comments, or actions during the 15 years of plaintiff's employment in the Sheriff's Department. Plaintiff could not testify to any anti-Arab or anti-Muslim comments made by Sgt. Bemis or Sheriff Napoleon, and he testified affirmatively that no supervisor had ever made a comment that he believes was racist or anti-Muslim. Under these facts, we cannot say that the use of "learned trade of fraud" constitutes direct evidence of discrimination.

Where, as here, direct evidence is lacking, to avoid summary disposition, plaintiffs must meet the requirements set forth in *McDonnell Douglas v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)." *Hazle*, 464 Mich at 462. First, the plaintiff must establish a prima facie case of discrimination. *Id*. at 463. If the plaintiff meets this burden, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its employment decision . . . ." *Id*. at 463-464. If the employer meets this burden, "the presumption created by the *McDonnell Douglas* prima facie case drops away." *Id*. at 465. The burden then shifts back to the plaintiff for the third and final stage of the *McDonnell Douglas* test. To survive a motion for summary disposition at this point, the plaintiff must "demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id*. (quotation marks and citation omitted). "[A] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful] discrimination." *Id*. at 465-466 (quotation marks and citation omitted).

To establish a prima facie case of discrimination, plaintiff had to show that (1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for his position; and (4) he suffered the adverse employment action under circumstances that give rise to an inference of unlawful discrimination. *Wilcoxon v Minn Mining & Mfg Co.*, 235 Mich App 347, 361; 597 NW2d 250 (1999). The parties primarily dispute the

fourth element, being whether plaintiff has shown evidence that his termination occurred under circumstances that give rise to an inference of discrimination based on race or religion.[5]

Plaintiff first finds evidence of discriminatory animus in an e-mail exchange between Sgt. Bemis and Special Agent Nadolinski of the CBP in which plaintiff asserts that Sgt. Bemis accused him of being a potential "homeland security" threat or person of interest. We do not agree with plaintiff's strained interpretation of the e-mails. The plain language of the exchanges reveals mutual assurances that each officer would share with the other information relevant to the other's law enforcement responsibilities and jurisdiction. We do not see in this exchange of professional courtesies any accusations against plaintiff.

Plaintiff also finds evidence of discriminatory animus in two events that occurred after his termination. Shortly after plaintiff's termination, an e-mail circulated informing recipients of the revocation of plaintiff's security clearance. Attached to the e-mail was a photograph that purported to be that of plaintiff, but which was actually that of his brother, who also is a sheriff's deputy and whose last name and the first initial of his first name are the same as plaintiff's. Ten months after plaintiff's termination, a request for training submitted by a different Arab-American deputy who worked in the same unit as plaintiff was denied on the erroneous assumption that the requesting deputy was under investigation. This error was corrected when Sgt. Bemis, responding to an inquiry from Deputy Chief Guy, informed her that the requesting deputy was not under investigation. Plaintiff contends that these are examples of Arab-Americans being "discriminatorily targeted" and "accused of being plaintiff simply because of similar sounding Arab names[.]" Yet, viewed in their context, these incidents appear merely to be mistakes of the type one might expect to encounter in a large organization. Even if we were to take plaintiff's view of these incidents, plaintiff leaves us to guess how two events that happened to other people after his termination give rise to an inference that racial and religious discrimination was a motivating factor in his termination.

Because neither the e-mail exchange nor the post-termination incidents invoked by plaintiff provide indirect evidence that plaintiff's termination occurred under circumstances that give rise to an inference of unlawful discrimination, we hold that plaintiff has failed to meet his burden to establish a prima face case under *McDonnell Douglas*. *Wilcoxon*, 235 Mich App at 361. Accordingly, we conclude that the trial court did not err in granting summary disposition to defendants of plaintiff's workplace discrimination claims brought under the ELCRA.

---

[5] The parties do not dispute that plaintiff is a member of a protected class and that he suffered an adverse employment action. On appeal, defendants dispute the third element, claiming that plaintiff has not shown that "an admitted steroid user and alleged credit card fraud concealer with a history of workplace discipline is qualified to be a police officer." Although defendant claims to have reserved the right to argue this point on appeal, a litigant does not properly preserve an issue for appellate review unless the issue is raised, argued, and decided below. See *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). This Court is obligated to review only issues that are properly raised and preserved. *Mich Ed Ass'n v Secretary of State*, 280 Mich App 477, 488; 761 NW2d 234 (2008), rev'd on other grounds 488 Mich 18 (2010).

## C. RETALIATION

Plaintiff next contends that the trial court erred by granting Sheriff Napoleon summary disposition of his retaliation claim against Sheriff Napoleon. We disagree.

To establish a prima facie case for retaliation, a plaintiff must show:

> (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. [*Garg v Macomb Co Mental Health Servs*, 472 Mich 263, 273; 696 NW2d 646 (2005) (quotation marks and citation omitted.]

The sole dispute relative to this issue is whether plaintiff has raised a genuine issue of material fact regarding whether a causal connection exists between the protected activity of filing a lawsuit and Sheriff Napoleon's denial of his request for restoration of police powers. Plaintiff contends that he followed departmental policy in requesting restoration of his police powers, but that Sheriff Napoleon denied the request because plaintiff had filed the underlying lawsuit. He argues that the "proximity in time" between the filing of the lawsuit and Sheriff Napoleon's denial is evidence of a causal connection.

Plaintiff is mistaken to the extent he believes restoration of police powers should have followed automatically upon his meeting specific departmental procedures for requesting them. Michigan law affords sheriffs the power to appoint and to revoke appointment of deputies, MCL 51.70[6], and the matter lies "exclusively within the [sheriff's] discretion," is "inherent in the nature of his office, and may neither be infringed upon by the Legislature nor delegated to a third party." *Natl Union of Police Officers Local 502-M, AFL-CIO v Bd of Comm'rs of Wayne Co*, 93 Mich App 76, 89; 286 NW2d 242 (1979). Given Sheriff Napoleon's exclusive discretion in this matter, plaintiff's argument, without more, that a causal connection exists between the filing of the underlying lawsuit and Sheriff Napoleon's denial of his request merely exemplifies the logical fallacy that where one incident follows another, the first incident must have caused the second.

Plaintiff also refers to Sheriff Napoleon's deposition testimony that whether to restore police powers to plaintiff was a matter of discretion for which he was not required to give a reason and for which he was not going to give a reason. Plaintiff finds it significant that the sheriff never denied that his refusal to grant plaintiff police powers was in retaliation for plaintiff's lawsuit. We disagree with plaintiff's assessment of the sheriff's testimony. The sheriff neither denied nor affirmed *any* reason for declining to restore police powers to plaintiff, but steadfastly maintained that he never gives a reason for his decisions to withhold police powers. To find it important that Sheriff Napoleon did not deny retaliation as a reason

---

[6] MCL 51.70 provides in pertinent part that "[e]ach sheriff may appoint 1 or more deputy sheriffs at the sheriff's pleasure, and may revoke those appointments at any time."

misrepresents the record by implying that the sheriff denied some reasons, just not retaliation. Essentially, plaintiff is asserting, without any supporting evidence, that in the absence of a reason for the sheriff's denial, retaliation must be the reason.

In addition, plaintiff stresses Napoleon's testimony that he is the only person who knows why he denied plaintiff's request for restoration of police powers, as well as the sheriff's statement, "what [plaintiff] really wants I'm the only person who can give it to him." Plaintiff finds in these statements both direct and indirect evidence of retaliation. Plaintiff asserts in his brief to this Court that when the quoted statement is "read carefully, Defendant Napoleon admits that this lawsuit has played a role in his refusal to restore Plaintiff's police powers." But, to arrive at plaintiff's interpretation requires that we adopt the same circular reasoning that informs plaintiff's reading and start with the assumption that the sheriff's denial was an act of retaliation. Read plainly, the quoted statement is direct evidence of the sheriff's awareness that plaintiff seeks restoration of police powers and of his knowledge that the restoration of police powers lies in his discretion. The statement is not direct evidence of retaliation; even if believed, it does not require the reader to conclude that retaliation was a motivating factor in Napoleon's decision.

Plaintiff also asserts that the Sheriff's testimony regarding the restoration of police powers to plaintiff is not credible and that the jury should consider the testimony alongside plaintiff's insistence on retaliation as a motivating factor to see which explanation the jury believes. The problem with this argument is that under the current state of the law, the restoration of police powers to plaintiff is at the sheriff's discretion, and plaintiff has cited no authority requiring the sheriff to explain why he exercised his discretion by denying plaintiff's request. Thus, the law supports Sheriff Napoleon's position, while plaintiff has provided not a shred of evidence or legal authority sufficient to raise a genuine issue of material fact that the sheriff denied his request out of retaliation.

Fallacious and circular reasoning does not raise fact questions regarding existence of a causal connection between plaintiff's lawsuit and Sheriff Napoleon's denial of his request for restored police powers. Thus, plaintiff's claim of retaliation fails, and we hold that the trial court did not err in granting summary disposition of plaintiff's retaliation claim to Sheriff Napoleon under MCR 2.116(C)(10).[7]

## D. DEFAMATION

Plaintiff argues that the trial court erred in granting Sgt. Bemis summary disposition of his defamation claim because the allegedly defamatory comments in Bemis's investigation report were entitled to neither absolute nor qualified privilege. Because Bemis's report was entitled to

---

[7] Plaintiff also argues that the law that gives Sheriff Napoleon sole discretion in granting police powers raises constitutional concerns because it does not provide a means of review should Napoleon exercise that discretion unconstitutionally. But, plaintiff has failed to present sufficient evidence to raise a fact question as to whether Napoleon exercised his discretion improperly, let alone unconstitutionally. Therefore, we have no reason to consider the constitutional question.

qualified privilege, we disagree. The applicability of a privilege is a question of law that this Court reviews de novo. *Oesterle v Wallace*, 272 Mich App 260, 263; 725 NW2d 470 (2006).

To prevail on a defamation claim, a plaintiff must prove:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005).]

"A plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Sarkar v Doe*, 318 Mich App 156, 184; 897 NW2d 207 (2016) (quotation marks and citation omitted). Plaintiff does not specify in his amended complaint the exact language that is the basis of his claim of defamation against Bemis. Rather, he alleges generally that Bemis's investigation report "contained intentionally false, misleading, defamatory, and slanderous accusations that [plaintiff] has known of criminal activity within the Arab American Community[,]" and accused plaintiff of "admitting to knowing about fraud in the Arab American Community." The statements in the report that most likely correspond to these allegations are that plaintiff "made admissions of criminal activity that had occurred prior to, and during, his employment with Wayne County Sheriff's Office," and that he "admitted that this criminal activity involved himself and his relatives." These two statements convey the substance of Special Agent Nadolinski's complaint against plaintiff and are the only ones in Sgt. Bemis's report that correspond to the allegations in plaintiff's amended complaint.

"Privilege can be used as a defense in a defamation action." *Bedford v Witte*, 318 Mich App 60, 65; 896 NW2d 69, 72 (2016), citing *Postill v Booth Newspapers, Inc*, 118 Mich App 608, 618; 325 NW2d 511 (1982). A statement subject to absolute privilege is "not actionable even if it was false and maliciously published." *Oesterle*, 272 Mich App at 264. "[A]bsolute privilege against a defamation action is limited to narrowly defined areas." *Id*. "Qualified privilege exists in a much larger number of cases. It extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty." *Timmis v Bennett*, 352 Mich 355, 366; 89 NW2d 748 (1958), quoting *Bacon v Michigan Central R Co*, 66 Mich 166, 170; 33 NW 181 (1887). "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak v RL Polk Co*, 193 Mich App 1, 15; 483 NW2d 629, 636 (1992).

The interest to be upheld in the case at bar was for the Sheriff's Department to be staffed with officers who do not violate the ethics, rules, and regulations of the department in ways that could potentially undermine the reputation and law enforcement efforts of the department. The occasion for the investigation was the department's receipt of a complaint from federal agents that plaintiff admitted to involvement in or knowledge of criminal activity before and after he became a law enforcement officer. The contested statements accurately summarized or quoted what the federal agents reported and were limited in scope to the interest to be upheld. Nothing

in the record indicates that Bemis published the statements to any other than proper parties: Captain Bulifant, Bemis's immediate supervisor, Deputy Chief Guy, whose responsibility it was to determine whether discipline was necessary, and plaintiff's union representative, in accordance with the collective bargaining agreement. Thus, four of the elements required to prove entitlement to qualified privilege—elements two through five—are met.

Regarding the first element, good faith, plaintiff contends that the trial court's finding that Bemis did not act in bad faith when preparing the report was an impermissible credibility determination. Plaintiff's argument overlooks the fact that the initial question of whether qualified privilege attaches to Bemis's statements is a question of law for the trial court to decide, *Couch v Schultz*, 193 Mich App 292, 294; 483 NW2d 684 (1992), and, therefore, necessarily requires the trial court to determine whether the record supports a finding of good faith.

Good faith may be found where publication is based on a verified source, there is no reason to doubt the accuracy of the source's information, and the allegations are not so improbable that only a reckless person would circulate them. See *St Amant v Thompson*, 390 US 727, 732; 88 S Ct 1323; 20 L Ed 2d 262 (1968). In the present case, Bemis knew that the source of the statements was Special Agent Pelfrey, who had spoken directly with plaintiff during a polygraph examination that lasted more than six hours. Bemis sought to verify the accuracy of the information he received by speaking directly with Pelfrey and by obtaining an audio recording of Pelfrey's post-questioning conversation with plaintiff. After enhancing and listening to the audio recording, Bemis confirmed that there were no discrepancies between the audio recording and Pelfrey's report of what he and plaintiff discussed. Thus, there was no reason for him to doubt the general accuracy of the information. *Id*. Further, Bemis's own interview with plaintiff confirmed the contours of plaintiff's discussion with Pelfrey, which suggests that the allegations were not so improbable that only a reckless person would circulate them. *Id*. We also note that, in order to provide a full and objective account of the matter, Bemis attached both a transcript of his interview with plaintiff and a copy of Pelfrey's report to the investigation report he submitted to his superior. Given these facts, we cannot say that the trial court erred in concluding that Bemis acted in good faith. Therefore, we hold that the contested statements are entitled to qualified privilege. However, our analysis does not end here.

A plaintiff can overcome the finding of qualified privilege by presenting evidence of actual malice. *Prysak*, 193 Mich App at 15. "Actual malice is defined as knowledge that the published statement was false or as [sic] reckless disregard as to whether the statement was false or not." *Kefgen v Davidson*, 241 Mich App 611, 624; 617 NW2d 351 (2000) (quotation marks and citation omitted). "Reckless disregard is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published." *Id*. Here, plaintiff need only present evidence raising a fact question regarding whether it is more likely than not that Bemis published the statements with malice. *Timmis*, 352 Mich at 367.

Plaintiff presented no evidence, nor do we find any in the record, that would raise a genuine issue of material fact regarding whether Bemis knew that the published statements were false. The information came from a law enforcement source, which Bemis might reasonably consider reputable, and plaintiff confirmed that he said some of the things Pelfrey attributed to

-10-

him, including that he knew about a credit card fraud ring, that someone had approached him to participate in the fraud, and that he had taken anabolic steroids, potentially illegally. Based on this evidence, it does not appear that Bemis knew, or even could have known, that the general statements he included in his investigation report were false.

Likewise, plaintiff presented no evidence, nor do we find any in the record, that would raise a genuine issue of material fact that Bemis "entertained serious doubts concerning the truth of the statements published" and, thus, acted with reckless disregard of whether his statements were false of not. *Kefgen*, 241 Mich App at 624. The efforts Bemis took to ask Pelfrey clarifying questions about his report and to verify the general accuracy of the report against the audio recordings runs counter to any suggestion that he had a reckless disregard for the truth or falsity of what he put in his report. Moreover, Bemis testified that he had doubts about plaintiff's truthfulness during his interview with plaintiff. There simply is no record evidence that Bemis recklessly published statements about which he entertained serious doubts. *Id*.

Plaintiff contends that malice is evident in the fact that Bemis reported Special Agent Pelfrey's statement attributing the phrase "learned traded" of fraud to plaintiff even though Bemis testified that he did not hear plaintiff utter that phrase on the audio recordings. The basis of plaintiff's argument is his rejection of Bemis's testimony regarding what he meant when he said he "confirmed" Pelfrey's conversation with plaintiff. Bemis testified that the quality of the audio recording prohibited him from confirming details and phrases, but allowed him to confirm the gist of the conversation, i.e., that Pelfrey and plaintiff discussed the subject matter indicated in Pelfrey's report. Rejecting this explanation, plaintiff argues that Bemis's statement of confirmation could only mean that he confirmed details and phrases, and that publishing Pelfrey's attribution of a phrase to plaintiff that Bemis did not hear plaintiff utter was evidence of malice. Plaintiff's argument is unpersuasive. He provides no reason or evidentiary support for his rejection of Bemis's sworn testimony. Moreover, the record shows that faced with Special Agent Pelfrey's report attributing the phrase to plaintiff and plaintiff's interview responses denying having said the phrase, Bemis attached both to his investigation report. In light of these circumstances, we cannot say that plaintiff has raised a fact question regarding whether Bemis knew that his published statements were false or acted with reckless disregard as to whether they were false or not. *Kefgen*, 241 Mich App at 624.

Because plaintiff has not presented evidence that raises a fact question regarding whether it is more likely than not that Bemis published the statements with malice, *Timmis*, 352 Mich at 367, we conclude that trial court did not err in granting Bemis summary disposition of plaintiff's defamation claim on grounds of qualified privilege.

Affirmed.

/s/ Jane M. Beckering
/s/ Michael J. Kelly
/s/ Colleen A. O'Brien

-11-