*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MONICA GREASON,

Plaintiff-Appellant,

v

AUBURN PHARMACEUTICAL COMPANY,

Defendant-Appellee.

UNPUBLISHED
September 15, 2025
1:22 PM

No. 371734
Oakland Circuit Court
LC No. 2022-197571-CD

Before: LETICA, P.J., and RICK and BAZZI, JJ.

PER CURIAM.

In this employment-discrimination action brought under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, plaintiff appeals as of right the order granting defendant partial reconsideration and dismissing plaintiff's remaining claims under MCR 2.116(C)(10) (no genuine issue of material fact). In a previous order, the trial court granted defendant's motion for summary disposition, in part, under MCR 2.116(C)(7) (statute of limitations), disposing of plaintiff's claims under the ELCRA that "accrued prior to December 1, 2019," but denied the motion in part under MCR 2.116(C)(10) for the ELCRA claims that "accrued between December 1, 2019[,] and December 20, 2019," and the claim for constructive discharge. After defendant moved for partial reconsideration, the trial court granted defendant's motion for summary disposition in its entirety. We affirm.

## I. BASIC FACTS AND PROCEDURAL BACKGROUND

This matter stems from plaintiff's employment as a part-time puller and packer (also known as picker and packer) at defendant's warehouse. Plaintiff, a Black woman, was approximately 55 years old when she started working for defendant in August 2017, and she was trained by defendant as a puller and packer. Plaintiff worked on weekday afternoons from about 3:00 p.m. until 6:00 p.m. When performing pulling functions, plaintiff was required to locate and remove medicine from shelves according to order forms and then place the medicine in bins to be processed. When packing, plaintiff reviewed order forms and medicine that were in the bins and packed the medicine to be shipped. On average, there were about 25 to 30 employees in the warehouse daily. Defendant

-1-

primarily hired high school and college students, as well as retired individuals in their 50s and 60s, as part-time pullers and packers.

The warehouse was supervised by a warehouse manager and an assistant manager. The manager monitored the premises and assigned staff to various functions on a daily basis. Assignments were made "on an ad hoc and as needed basis between pulling and packing functions based upon the workflow demands in the warehouse." During the latter part of plaintiff's tenure, the warehouse manager was Bill Legendre. Legendre served as plaintiff's supervisor between April 2019 and December 2019.

Plaintiff did not apply for any other full-time or part-time positions while employed with defendant. Legendre conducted a review of plaintiff's performance on January 22, 2019. In the review, Legendre remarked, "Accuracy when [pulling] orders is well below average," and, "Has been resistant at times when assigned to order [pulling]." Plaintiff's "attendance and punctuality" score was 4, or "very good." Plaintiff's overall performance score was "satisfactory." Plaintiff received two pay increases during her employment: an increase of 50 cents per hour in January 2018, and an increase of $1.35 per hour in February 2019. Defendant never demoted plaintiff.

On an unspecified date, plaintiff "asked [Legendre] if they were hiring any full[-]time [people] for the warehouse" and informed Legendre that she was "interested in full[-]time." Plaintiff alleged that she was never advised of any openings. However, plaintiff's primary complaint was that Legendre assigned her too frequently to perform the pulling function instead of the packing function. On March 6, 2019, plaintiff was pulling and "lifted or twisted wrong," which resulted in a "sharp" pain. Plaintiff requested instructions from Legendre regarding the filing of an accident report. The following day, plaintiff was reassigned to pulling. Plaintiff protested to defendant's Director of Human Resources, Christine Walker, when plaintiff felt the work was too strenuous. On April 24, 2019, plaintiff disclosed to Walker that pulling was "too hard." Plaintiff further reported to Walker that Legendre "doesn't accept feedback well," and Legendre stated to plaintiff that "everything you say is negative."

On other occasions, plaintiff expressed to Legendre she did not want to perform either the pulling or packing function. Legendre responded that "age doesn't matter when it comes to pulling." Plaintiff repeatedly informed Walker that pulling and packing was "hard on her body" and she "wanted to do something other than that," including on May 9, 2019, and June 12, 2019. At one instance, after sharing with Legendre that she did not wish to perform either the pulling or packing function, plaintiff was moved to the shipping-function section. Plaintiff "periodically asked to perform [] other warehouse functions," such as inventory scanning, which were not as physically demanding as pulling and packing. Plaintiff stated Legendre "never let [her] learn how to scan," and he solely permitted "the white girls [and] ladies" to perform the scanning function.

Plaintiff complained about Legendre's behavior and conduct.[1] Plaintiff visited Walker "several times about how [Legendre] treats [her] different and talks to [her] disrespectful[ly]." Plaintiff described Legendre's management style as "authoritative, directive, get-stuff-done kind

---

[1] Plaintiff approached the individual who preceded Legendre as warehouse manager about Legendre "a couple of times."

of way," and contended that Legendre was sometimes impatient. Plaintiff further asserted that Legendre did not "show[] compassion," used a specific "tone" with plaintiff, and never agreed with her. On May 9, 2019, plaintiff disclosed to Walker that Legendre "doesn't speak harshly to those he likes[:] the older men [and] young white girls." Plaintiff stated that Legendre was "prejudiced against Black people," including plaintiff.

At another juncture in September 2018 or October 2018, plaintiff had an incident with Paige Pierce, a 20-year-old white warehouse employee. After the episode, Pierce "started making [plaintiff's] job hard" by "pull[ing] up the invoices before we would pick, and [Pierce] would purposely put large orders in the basket for [plaintiff] to stop and go pull." After Pierce gave plaintiff a "big" order for the second or third time, plaintiff informed Legendre that Pierce "needs to give them to someone else." Plaintiff lamented to Legendre about how Pierce did not "do the stocking" because "she knew that was the aisle that [plaintiff] was going to pull." Plaintiff alleged that Legendre's attitude toward plaintiff "changed" after the incident because Legendre and Pierce "were tight."[2]

Plaintiff met with Walker on approximately a weekly basis to discuss her issues with Legendre and Pierce. Plaintiff reported to Walker on May 9, 2019, that Legendre "treats [her] different since that incident [with] [Pierce]." Plaintiff "periodically complained about various interpersonal issues with other warehouse employees, both at and outside of work." Legendre "counseled" plaintiff to contact Walker "to address her various complaints and issues." Walker could not recall whether plaintiff disclosed that any employee was attempting to make plaintiff quit. Plaintiff additionally criticized the physical toll of her position to Walker "quite a few times." During her last five months of employment with defendant, plaintiff pulled about 70% of the time. Plaintiff quit her position with defendant in December 2019. Plaintiff purportedly quit "in part" to move to Indiana, and because of her inability to acquire full-time employment with defendant and Legendre's behavior toward her.

On December 1, 2022, plaintiff filed a complaint alleging a hostile work environment, wrongful discharge, and age, race, and sex discrimination claims in violation of the ELCRA. Defendant subsequently moved for summary disposition under MCR 2.116(C)(7) and (C)(10), advancing that the majority of plaintiff's claims were barred under the three-year statute of limitations, specifically any allegations concerning defendant's alleged conduct before December 1, 2019. Following a motion hearing, the trial court granted defendant's motion for summary disposition, in part, on statute-of-limitations grounds under MCR 2.116(C)(7), and it partially denied the motion for summary disposition under MCR 2.116(C)(10). The court entered an order providing that summary disposition was proper under MCR 2.116(C)(7) "regarding all claims brought under the [ELCRA] that accrued prior to December 1, 2019," but improper "regarding claims brought under the [ELCRA] that accrued between December 1, 2019[,] and December 20, 2019[,] and the claim for constructive discharge," under MCR 2.116(C)(10).

Defendant moved for partial reconsideration of the trial court's order concerning summary disposition, requesting that the trial court grant summary disposition under MCR 2.116(C)(10) for plaintiff's remaining ELCRA claims arising in the interval between December 1, 2019, and

---

[2] Plaintiff maintained issues with Legendre before and after the incident with Pierce.

December 20, 2019, and the constructive discharge claim. After a hearing, the court granted defendant's motion for partial reconsideration, and it further granted defendant's motion for summary disposition "in its entirety." The trial court opined:

> The bullet points that the [trial court] referenced are bullet points, if you will, of [defendant] giving [plaintiff] a shipping assignment in her physical condition, negative performance reviews, and generalized talking down. Singularly reviewing them, collectively reviewing them, and collectively reviewing them among or amidst or against the backdrop of the entire factual allegations. All three views, all three bullet points, and from all three perspectives, if you will, there is no evidence, respectfully, of civil rights violation, age, race, gender discrimination. And the [trial court], as I've said, reverses itself and grants comprehensive motion for summary disposition.

In June 2024, the court entered an order consistent with its statements on the record, dismissing the underlying action. This appeal ensued.

## II. STANDARD OF REVIEW

"This Court reviews a trial court's decision to grant or deny a motion for reconsideration for an abuse of discretion." *Farm Bureau Ins Co v TNT Equip*, *Inc*, 328 Mich App 667, 672; 939 NW2d 738 (2019). "A trial court abuses its discretion if it chooses an outcome outside the range of principled outcomes." *Id*.

This Court "review[s] de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A de-novo review means [this Court] review[s] the legal issue independently, without deference to the lower court." *Bowman v Walker*, 340 Mich App 420, 425; 986 NW2d 419 (2022) (quotation marks and citation omitted). A motion for summary disposition under MCR 2.116(C)(10) "tests the *factual sufficiency* of a claim." *El-Khalil*, 504 Mich at 160. As explained by the Michigan Supreme Court:

> When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id*. (quotation marks and citations omitted).]

Specifically,

> the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence

establishing the existence of a material factual dispute, the motion is properly granted. [*Quinto v Cross and Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996) (citations omitted).]

"The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion." *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). "Statutory interpretation is a question of law, which this Court also reviews de novo." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 493; 791 NW2d 853 (2010).

## III. ANALYSIS

Plaintiff argues that the trial court erroneously granted defendant's motion for summary disposition in its entirety. Plaintiff specifically contends that her ELCRA claims for the time period between December 1, 2019, and December 20, 2019, and for constructive discharge, were improperly dismissed under MCR 2.116(C)(10). We disagree.[3]

## A. EMPLOYMENT DISCRIMINATION

Plaintiff first argues that the trial court wrongfully disposed of plaintiff's employment-discrimination claims on the basis of age, race, and sex, related to the interval between December 1, 2019, and December 20, 2019. Under MCL 37.2202(1)(a), as amended by 2023 PA 31,[4] an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." "The courts have recognized two broad categories of claims under this section: disparate treatment and disparate impact claims." *White v Dep't of Transp*, 334 Mich App 98, 107; 964 NW2d 88 (2020) (quotation marks and citation omitted). As detailed by the Michigan Supreme Court:

---

[3] We note that in the facts portion of her brief, plaintiff contends that the trial court abused its discretion by granting defendant's motion for partial reconsideration because defendant's bases for moving for partial reconsideration were predicated on improper theories, including (1) the fact the trial court had indicated the case could be resolved on a directed verdict, (2) defendant's false claims of misrepresentations made by plaintiff during the summary disposition proceedings, and (3) defendant's attempts to mischaracterize plaintiff's deposition testimony. However, these issues are not cited in plaintiff's statement of questions presented, *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 404; 628 NW2d 86 (2001), nor expounded upon in the argument section of plaintiff's appellate brief, *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 374; 761 NW2d 353 (2008). Accordingly, we decline to address these issues.

[4] We rely on the version of the statute in effect at the time of plaintiff's employment. MCL 37.2202 has since been amended to specify protections for individuals on the basis of sexual orientation, gender identity, and gender expression, which are inapplicable in the instant case.

A claim of age discrimination may be shown under ordinary principles of proof by the use of direct or indirect evidence. Alternatively, many courts, including this one, have used the prima facie test articulated by the United States Supreme Court in [*McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)] as a framework for evaluating age-discrimination claims. Originally applied to cases of race discrimination, the test has been modified to accommodate cases of age and sex discrimination. [*Town v Mich Bell Tel Co*, 455 Mich 688, 694-695; 568 NW2d 64 (1997) (footnotes and citations omitted).]

Because there is "no direct evidence of impermissible bias," plaintiff's claims are required to proceed under the *McDonnell Douglas* burden-shifting framework. *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). Under this framework, a plaintiff must establish a rebuttable prima facie case by presenting evidence that she is "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Town*, 455 Mich at 695. This prima facie test is designed "to force the employer to articulate a nondiscriminatory reason for the discharge." *Id*. "Once the employer produces evidence of a nondiscriminatory reason for the discharge, even if that reason later turns out to be incredible, the presumption of discrimination evaporates." *Id*. "[T]he evidence and inferences that properly can be drawn from the evidence presented during the plaintiff's prima facie case may be considered in determining whether the defendant's explanation is pretextual." *Id*. at 696 (quotation marks, footnote, and citation omitted).

"Once the presumption drops out of the case, the plaintiff retains the ultimate burden of proving discrimination." *Id*. "To prevail, the employee must submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge and that the plaintiff's [membership in a protected class] was a motivating factor in the employer's decision." *Id*. at 697. "Thus, the employee must prove that the employer's explanation was a pretext for discrimination." *Id*. A plaintiff can establish pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Campbell v Human Servs Dep't*, 286 Mich App 230, 241; 780 NW2d 586 (2009) (quotation marks and citation omitted).

"The proofs offered in support of the prima facie case may be sufficient to create a triable issue of fact that the employer's stated reason is a pretext, as long as the evidence would enable a reasonable fact-finder to infer that the employer's decision had a discriminatory basis." *Town*, 455 Mich at 697. "Ultimately, the plaintiff will have the burden of producing evidence, whether direct or circumstantial, that proves that discrimination was a determining factor in the employer's decision." *Id*. On summary disposition, "when viewed in the light most favorable to the plaintiff, the evidence must create a material issue of fact on which reasonable minds could conclude that the employer's stated reason is a pretext for discrimination for summary judgment to be precluded." *Id*. at 698.

Regarding what constitutes an adverse employment action, this Court has stated:

There is no exhaustive list of what constitutes adverse employment actions. And what might constitute an adverse employment action in one employment context might not be actionable in another employment context . . . . Nevertheless, regardless of the employment context, in order to be actionable, an employment action must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. In addition, there must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling. Materially adverse employment actions are akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. [*Chen v Wayne State Univ*, 284 Mich App 172, 201-202; 771 NW2d 820 (2009) (quotation marks and citations omitted).]

In the present case, the pertinent time frame for plaintiff's discrimination claims between December 1, 2019 and December 20, 2019. Notably, plaintiff does not provide any references to specific examples of alleged discrimination because of her age, race, or sex during this period, on appeal. Rather, plaintiff broadly contends that it is undisputed plaintiff was a member of a protected class and she was qualified for her position. Plaintiff limits her appellate argument to whether she suffered an adverse employment action, and she does not address the fourth element required to establish a prima facie case of discrimination, or whether "others, similarly situated and outside the protected class were unaffected by the employer's adverse conduct." *Town*, 455 Mich at 695. Plaintiff summarily asserts her discrimination claims are viable because she suffered the following adverse employment actions: (1) assignment to "more physical aspects of the job far more frequently tha[n] other employees"; (2) assignment to "roles outside of picker-packer only when they were more physically demanding"; (3) being "talked down to and otherwise demeaned by her supervisor"; and (4) being "accused of poor performance."

First, even assuming plaintiff was assigned to physically-intense functions in the relevant time period, this does not constitute an adverse employment action. Plaintiff did not provide any evidence to support her claim that defendant, via Legendre, assigned plaintiff to physically taxing job functions because of her age, sex, or race. On the contrary, plaintiff was employed as a part-time puller and packer and, although pulling was more physically demanding than packing, she acknowledged that both functions required performing physical tasks. Plaintiff informed Walker and Legendre that she was too frequently assigned to pulling, and she wished to be assigned more regularly to packing because "people [her] age" were assigned to perform packing functions. Plaintiff asserted that she was assigned to pull "all day, every day," but she lagged behind the "younger" employees. Plaintiff further contended that she performed pulling functions about 70% of the time she worked in her final five months. Plaintiff noted Legendre "doesn't put anyone else my age on pulling[.]" Legendre, however, stated that he assigned plaintiff to perform both functions because she was "hired and trained" to perform either. Further, plaintiff acknowledged that Legendre had no obligation to honor her requests to perform more packing. Rather, plaintiff understood both functions were her responsibility.

Plaintiff's notes indicate, "Someone said that they asked [Legendre] why I was on pulling, and he said [Legendre] told her that 'they're stronger,' meaning that I am Black," but she does not note who shared this allegation. Plaintiff additionally wrote a list of employees who were "around

[her] age, but they were always on packing[] [and] never had to pull in the [two years] that [she] worked there." At the end of the list, plaintiff stated that "most times there were [two or three] young ladies packing" and they "were white." Notwithstanding that these allegations are unsubstantiated, we note that Legendre expressed that his primary focus in managing the warehouse was "getting employees to perform their job duties," which included assigning and reassigning employees "on an ad hoc and as needed basis between pulling and packing functions based upon the workflow demands in the warehouse." The evidence also suggested that defendant hired high school and college students, in conjunction with retired individuals in their 50s and 60s, as part-time pullers and packers.

The record is absent of any indication that Legendre exclusively assigned older employees to packing when they were hired to perform both functions. Moreover, employees were assigned to various functions daily on the basis of how many orders were received and how many employees were available, which plaintiff recognized. To the extent plaintiff alleges that she was assigned more physically-demanding functions "despite known hardships," plaintiff fails to provide any evidence that she notified defendant, in writing, that she was unable to pull. Plaintiff lacks any documentation that she was physically unable to perform the pulling function, or that she required any accommodations to perform pulling less frequently. Further, plaintiff's January 22, 2019 performance review provided that plaintiff's accuracy "when [pulling] orders [was] well below average" and plaintiff was "resistant at times when assigned to order [pulling]." Plaintiff conceded that accuracy was "critically important" to ensure medicine was supplied and shipped correctly. There is no indication that plaintiff's assignment to pulling more than packing was "materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities." *Chen*, 284 Mich App at 201. While plaintiff disagreed with Legendre's distribution of assignments, the presented evidence demonstrated that Legendre maintained discretion to make assignments on a daily basis. There were no alterations to plaintiff's job responsibilities when she was assigned to perform functions that she was specifically hired to complete. Further, plaintiff received two pay raises, in 2018, and 2019, and she never applied for alternate positions.

Second, plaintiff's assignment to "roles outside of picker-packer only when they were more physically demanding" did not amount to an adverse employment action. Plaintiff does not substantiate the claim that Legendre assigned her to more physically-intense job functions outside of pulling and packing on the basis of her age, sex, or race. Plaintiff neglects to identify what the other functions were, when they occurred, or if they fell within the designated time frame. The record establishes, in addition to asking Legendre to be assigned to perform more packing, there were occasions when plaintiff informed Legendre and Walker that she did not want to perform either packing or pulling. At an unascertained date, Legendre assigned plaintiff to perform shipping functions. Plaintiff, however, did not "catch on" to this function, and she found it to be "more physical" than pulling and packing. Again, there is no evidence that the assignment was made because of plaintiff's race, sex, or age. Instead, it was in response to plaintiff's request to not pull or pack. To the extent plaintiff contends that she was not permitted to perform less physically-intense functions, such as inventory scanning, Legendre stated plaintiff had not been "hired or trained to do so," and that function was "reserved" for "full-time and/or long-term employees." Plaintiff's assertion suggesting such assignments were premised on race because allegedly only "white girls [and] ladies" were allowed to scan is additionally unsupported.

Third, plaintiff allegedly being "talked down to and otherwise demeaned by her supervisor" did not qualify as an adverse employment action, as plaintiff does not cite to any instances involving actionable conduct. The record featured broad accusations against Legendre, including an occasion during which Legendre called plaintiff "negative," after she reported an incident involving employees who were name-calling one another. Plaintiff further contended that Legendre was not compassionate toward plaintiff, maintained a "tone of voice," and spoke disrespectfully to plaintiff. Plaintiff asserted that she was a victim of Legendre's "bigotry" and "would have tears in [her] eyes[] knowing [she] was going to have to deal with [Legendre's] [] racism[.]" Yet, plaintiff simultaneously advanced that Legendre managed in a "authoritative, directive, get-stuff-done kind of way." In her notes, plaintiff expressed, "One of the ladies that had over 20 years told me that [] [Legendre] doesn't talk to the women like he talks to the men. He talks at the women, but he talks to the men with respect." Aside from these speculative contentions, there is no evidence suggesting Legendre targeted plaintiff due to her age, sex, or race, and while plaintiff advances that Legendre tried to "belittle" other employees, she does not cite to any precedent indicating that such conduct is unlawful.

Fourth, plaintiff being "accused of poor performance" is not deemed an adverse employment action. The record provides that, on one occasion, Legendre informed plaintiff that she "did a good job packing." Plaintiff's January 22, 2019 performance review resulted in a "satisfactory" rating. Plaintiff's "quality of work" was rated a score of 2, or "needs improvement," and the review detailed, "Accuracy when [pulling] orders is well below average." Plaintiff's "productivity" rating was 3, or "satisfactory," but plaintiff was "resistant at times when assigned to order [pulling]." The performance review further provided that plaintiff arrived "on time ready to work" and "worked extra hours when requested to do so." Plaintiff does not elaborate as to how she was "accused of poor performance" or how such would constitute an adverse employment action. Further, there were no consequences for her alleged subpar performance, given that plaintiff received raises and she was not demoted to a lower position.

Plaintiff argues this Court must consider the United States Supreme Court's opinion in *Burlington Northern and Santa Fe Ry Co v White*, 548 US 53, 69; 126 S Ct 2405; 165 L Ed 2d 345 (2006) (quotation marks and citation omitted), for the proposition that "a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others." In *White*, the United States Supreme Court examined the antiretaliation provision of Title VII, which "refer[red] to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective," and it concluded "that Title VII's substantive provision and its antiretaliation provision are not coterminous." *Id*. at 67-70. Yet, plaintiff broadly argues this Court's opinion in *White*, 334 Mich App at 98, dictates that the United States Court of Appeals for the Sixth Circuit and "Michigan courts" do not limit adverse actions to a list, and discrimination claims are analyzed similar to retaliation claims. "[W]hile we are not bound by Title VII caselaw, Michigan courts regularly look to it for guidance in interpreting ELCRA." *Id*. at 116. However, this Court in *White* acknowledged, "The antiretaliation provisions of both ELCRA and Title VII differ from their respective antidiscrimination provisions in that the antiretaliation provisions bar retaliation or discrimination with no limitation on the type of acts that would be considered unlawful." *Id*. at 116-117. Further, this Court "adopt[ed] the reasonable-employee standard for determining whether an employer has committed a retaliatory adverse employment action under ELCRA." *Id*. at 120-121. "Given that the antiretaliation provision does not contain the limiting language used

in the substantive discrimination provision, there is no basis in MCL 37.2701(a) to limit retaliatory acts under ELCRA to those affecting the terms and conditions of employment such as pay, hiring, and firing." *Id*. at 121. Stated alternatively, this analysis does not apply to claims of discrimination.

Plaintiff additionally contends that she must show "only some injury respecting her employment terms or conditions," citing the United States Supreme Court's decision in *Muldrow v City of St Louis, Missouri*, 601 US 346, 359; 144 S Ct 967; 218 L Ed 2d 322 (2024). Even assuming this standard applies, there is no evidence that plaintiff suffered any injury concerning the terms or conditions of her employment. Plaintiff also lists guidelines as to various forms of adverse actions listed by the Equal Employment Opportunity Commission, but provided no caselaw or other authority suggesting these guidelines are binding on this Court.

Plaintiff does not establish that she suffered any adverse employment actions, which is an essential element underlying her claims of discrimination in violation of the ELCRA. Plaintiff does not address the fourth element under the *McDonnell Douglas* framework, or allege that other employees who were similarly situated and outside her protected class were unaffected by any adverse conduct. See *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 361; 597 NW2d 250 (1999) ("Circumstances give rise to an inference of discrimination when the plaintiff was treated differently than persons of a different class for the same or similar conduct.") (Quotation marks and citation omitted). Accordingly, the trial court properly granted defendant's motion for summary disposition under MCR 2.116(C)(10) regarding plaintiff remaining employment-discrimination claims.

## B. HOSTILE WORK ENVIRONMENT

Plaintiff similarly contends that her hostile work environment claims arising in the time period between December 1, 2019, and December 20, 2019, were inappropriately dismissed. The elements necessary to establish a prima facie case of a hostile work environment are:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of [her protected status]; (3) the employee was subjected to unwelcome . . . conduct or communication [involving her protected status]; (4) the unwelcome . . . conduct was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. [*Quinto*, 451 Mich at 368-369 (alterations in original; quotation marks and citation omitted).]

The existence of a hostile work environment is dependent on "whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke v Everett*, 442 Mich 368, 394; 501 NW2d 155 (1993). Evidence containing "mere conclusory allegations" that are "devoid of detail" do not "permit the conclusion that there was such conduct or communication of a type or severity that a reasonable person could find that a hostile work environment existed." *Quinto*, 451 Mich at 371-372. Thus, plaintiff was required to demonstrate that Legendre's comments to her "were sufficiently severe or pervasive to create a hostile work environment." *Id*. at 369.

Rather than advancing any argument related to any of the five elements required to establish a hostile work environment claim, plaintiff merely restates that she suffered the adverse employment actions previously detailed. Plaintiff provides no examples or analysis regarding how Legendre talked down to plaintiff or demeaned her during the relevant time interval. Moreover, plaintiff does not assert that any of Legendre's comments or broader conduct was related to any of her protected statuses. Instead, plaintiff accuses defendant of not presenting "any legal argument as to why Plaintiff's hostile work environment claims should be dismissed" during the trial court proceedings.

Nonetheless, our review of the lower court record does not reveal any incidents of sexist, racist, or ageist comments supporting an inference of a hostile work environment in the pertinent time period. Plaintiff broadly concludes that Legendre created a hostile work environment by advancing discriminatory remarks against her, and plaintiff was mentally and physically stressed because of Legendre's behavior. Plaintiff described Legendre as authoritative and sometimes impatient, but she acknowledged that Legendre exhibited a similar disposition to other employees. Plaintiff's primary contention was that Legendre was not compassionate to her, spoke to her disrespectfully, and never agreed with her. More generally, in her notes, plaintiff alleged that there was a hostile work environment and she was a victim of Legendre's bigotry. On May 9, 2019, plaintiff reported to Walker that Legendre "doesn't speak harshly to those he likes[:] the older men [and] young white girls." Plaintiff also asserted that Legendre was "prejudiced against Black people," including plaintiff and two other women not fully identified. Plaintiff disclosed, "I would come to work stressed knowing that I had to deal with [Legendre's] [racist and sexist] personality."

As for specific examples, on December 5, 2018, plaintiff informed Legendre "the aisles are not stocked," and Legendre responded, "[D]on't tell me that Maria doesn't stock her aisle" and that plaintiff was "always negative." On January 3, 2019, plaintiff had to "make a lot of boxes," and Legendre replied, "Now I have to take time to move the boxes." On January 7, 2019, plaintiff had a "big" order at the "end of the night," but Legendre did not "ask anyone to help [her]" and instead "let everyone leave." On April 24, 2019, plaintiff informed Walker that Legendre was not accepting her feedback and, instead, reiterated that "everything [she] [said] is negative." Plaintiff stated in her notes, on the first day she was assigned to perform the shipping function, Legendre commented "having f*****g fun." Plaintiff further alleged that certain "ladies that were getting close to retirement age told [her] that they couldn't wait to retire" and "a couple of them told [her] they feel like [Legendre] is [sexist] and that he definitely caters to the men." Legendre purportedly "lets the men stand around and talk more so than the women." Plaintiff additionally asserted, "The women say that [Legendre] favors the men and I feel like he favors men [and] whites over African American[s] [and] Chaldeans." On one occasion, plaintiff believed that Legendre had "animosity" toward Black persons because when employees were playing music by Kanye West, Legendre stated, "I hate him." Plaintiff asked Legendre: "How do you hate someone you don't know?" Legendre answered, "Well, I mean his music." Legendre directed the "the young people," that "if you guys turn back to that station, we just won't be listening to a radio." On days when rap music was playing, Legendre "would just turn it completely off and tell them not to turn it back on."

Plaintiff further detailed an incident she had with a coworker, Pierce, in September 2018, or October 2018, which resulted in Pierce making plaintiff's job more difficult, including giving plaintiff larger orders to pull. Plaintiff noted that Legendre's attitude toward her changed after the incident because Legendre and Pierce were close. In her notes, plaintiff speculatively stated:

"[A]fter a few months, [Pierce] and [Legendre] seem like they were buddies, so then she started making my job harder for me on pulling. I really believe the [two] of them were trying to get me to quit my job." On unknown dates, Pierce "put a cart order on the line" intentionally or she did not stock an aisle when plaintiff was assigned to it.

Setting aside her interpersonal issues with Pierce and other coworkers, plaintiff did not include any examples of Legendre himself making her job more difficult. Plaintiff did not sufficiently explain how Legendre's conduct or comments were predicated on plaintiff belonging to a protected class. Further, although the record indicated that Legendre's management style was authoritative, this does not warrant the conclusion that there was "such conduct or communication of a type or severity that a reasonable person could find that a hostile work environment existed." *Quinto*, 451 Mich at 372. Most critically, the contested conduct did not occur during the relevant time period. Consequently, the trial court did not err by dismissing plaintiff's hostile work environment claims.

## C. RETALIATION

Plaintiff further argues that she presented viable retaliation claims related to the time period between December 1, 2019, and December 20, 2019. MCL 37.2701(a) prevents persons from discriminating or retaliating "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." This Court has provided:

> To establish a prima facie case of retaliation, a plaintiff must show: (1) that he [or she] engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. [*Major v Village of Newberry*, 316 Mich App 527, 552-553; 892 NW2d 402 (2016) (quotation marks and citation omitted).]

On appeal, plaintiff does not address the first element or otherwise assert she engaged in a protected activity. However, in her complaint, plaintiff alleged the protected activity at issue in her age-based retaliation claim included plaintiff disclosing "complaints about the discriminatory and age-biased tasks she was given." Concerning the sex-based retaliation claim, plaintiff contended that the protected activity was sharing "complaints about discrimination because she was a woman." As for the race-based retaliation claim, plaintiff asserted that the protected activity was reporting "the racial discriminations she was continually experiencing." In her appellate brief, plaintiff reiterates that she suffered the previously detailed adverse employment actions. For the reasons stated above, the cited conduct did not constitute an adverse employment action. The record provides that plaintiff complained to Walker about Legendre's behavior, in addition to her dissatisfaction with pulling more frequently than packing. Even assuming plaintiff engaged in a protected activity by regularly expressing her grievances to Walker, the evidence does not indicate that defendant took any adverse action against plaintiff. Accordingly, the trial court appropriately dismissed plaintiff's remaining retaliation claims.

## D. CONSTRUCTIVE DISCHARGE

Plaintiff lastly argues that her wrongful discharge, or constructive discharge claim, brought "in violation of Michigan Public Policy," was sufficient. Plaintiff fails to cite any authority on this issue, and she merely restates that she "has support and a basis for the only contested element of adverse action." See *Johnson Family Ltd Partnership v White Pine Wireless*, *LLC*, 281 Mich App 364, 374; 761 NW2d 353 (2008) ("Because this issue was not properly briefed on appeal, [the party] has abandoned any claim of error in that regard.") Rather, plaintiff broadly contends Legendre mistreated her and put her "on a demanding job," which "caused her to leave."

As explained by this Court:

> [C]onstructive discharge is not in itself a cause of action but, rather, a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily. A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign. A question of fact exists when reasonable people could reach different conclusions as to whether these elements were established. [*Jewett v Mesick Consol Sch Dist*, 332 Mich App 462, 471-472; 957 NW2d 377 (2020) (alteration in original; quotation marks and citations omitted).]

While plaintiff was dissatisfied with her assignment to the pulling function more frequently than the packing function, she was employed and trained to perform both roles. Plaintiff never notified defendant in writing that she was unable to perform the pulling task or that she required any accommodations. Moreover, the record indicates that plaintiff quit her position "in part" to move to Indiana, rather than as a result of Legendre's alleged conduct or her inability to obtain a full-time position with defendant. Walker noted that plaintiff "had been saying that she was going to move to Indiana anyway to be with one of her children." Plaintiff additionally never applied for different positions with defendant or for external employment. Thus, her wrongful or constructive discharge claims were properly dismissed.

Ultimately, the trial court's decision to grant defendant's motion for partial reconsideration did not constitute an abuse of discretion. The trial court properly determined that summary disposition regarding plaintiff's remaining claims under MCR 2.116(C)(10) was warranted.

Affirmed.

/s/ Anica Letica
/s/ Michelle M. Rick
/s/ Mariam S. Bazzi